RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0325P (6th Cir.)
File Name: 01a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LAURA BAIRD, *et al.*,
    *Plaintiffs-Appellants,*

    *v.*

GALE A. NORTON, in her
official capacity as Secretary
of the Interior,[*] and UNITED
STATES DEPARTMENT OF THE
INTERIOR,
    *Defendants-Appellees.*

No. 99-1822

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 99-00014—David W. McKeague, District Judge.

Argued: August 4, 2000

Decided and Filed: September 14, 2001

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton is automatically substituted for Bruce Babbitt, former Secretary of the Interior, as defendant in this action.

1

Before:  MOORE and CLAY, Circuit Judges; RICE, Chief
District Judge. [**]

———————————

**COUNSEL**

———————————

**ARGUED:**   Kevin J. Moody, MILLER, CANFIELD,
PADDOCK & STONE, Lansing, Michigan, for Appellants.
Joan E. Meyer, ASSISTANT UNITED STATES
ATTORNEY, Grand Rapids, Michigan, for Appellees.
**ON BRIEF:**   Kevin J. Moody, Louis B. Reinswasser,
MILLER, CANFIELD, PADDOCK & STONE, Lansing,
Michigan, for Appellants.   Joan E. Meyer, ASSISTANT
UNITED STATES ATTORNEY, Grand Rapids, Michigan,
for Appellees.

   MOORE, J., delivered the opinion of the court, in which
CLAY, J., joined.  RICE, D. J. (pp. 10-17), delivered a
separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

   KAREN NELSON MOORE, Circuit Judge. Michigan state
legislators Laura Baird and Gary Peters challenge former
Interior Secretary Bruce Babbitt's approval of gaming
compacts between the State of Michigan and four Indian
tribes.   Baird, a member of the Michigan House of
Representatives, and Peters, a Michigan state senator, brought
suit seeking a declaration that the gaming compacts are
invalid and an order directing the secretary to disapprove

———————————

   [**]The Honorable Walter Herbert Rice, Chief United States District
Judge for the Southern District of Ohio, sitting by designation.

them.[1] Baird and Peters argue that the compacts approved by Babbitt were never properly entered into by the State of Michigan because the state legislature followed unconstitutional procedures in considering them. Thus, they argue, Secretary Babbitt could not properly approve the compacts under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq*. On May 21, 1999, the district court granted the secretary's motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and (6). In granting the secretary's motion to dismiss, the district court concluded that Peters did not have Article III standing, as a state legislator, but that Baird did. With respect to Baird, the district court concluded that IGRA did not include an implied right of action, that Baird was not in the zone of interests protected by IGRA, and thus that Baird did not have standing to challenge the secretary's action under the Administrative Procedure Act, 5 U.S.C. § 702. Because we conclude that neither Baird nor Peters has Article III standing, we **AFFIRM** the district court's granting of the secretary's motion to dismiss.

## I. BACKGROUND

Baird and Peters contend that the Michigan state legislature did not follow procedures required by the state constitution for approval of the gaming compacts at issue. Rather than approve the compacts by legislation, which requires that a majority of the members of both the state house of representatives and state senate vote in favor of the measure, *see* Mich. Const. art. IV, § 26, the state legislature approved the compacts by concurrent resolution — in this case, by Concurrent Resolution ("CR") 115. Passage of a concurrent resolution, however, requires only a majority of votes cast

---

[1] Janet Rochefort, Treasurer of Jackson County, Michigan, was also a plaintiff in this litigation. The district court dismissed her claims for lack of standing. Although Rochefort was listed in the notice of appeal, the dismissal of her claims has not been argued by the appellants. Moreover, Rochefort lacks standing for the reasons given by the district court; she cannot establish an injury in fact because the gaming compacts in issue do not provide for casinos in Jackson County.

rather than a majority of all members' votes. Thus, the Michigan House of Representatives, comprised of 110 members, approved the gaming compacts by a vote of forty-eight to forty-seven, with Baird voting in the minority. Although this vote margin would have been insufficient to enact legislation, it was sufficient to pass CR 115. In the Michigan Senate, which has thirty-eight members, CR 115 passed by a vote of twenty-one to seventeen, with Peters in the minority. The Senate vote on the concurrent resolution, then, would have been sufficient to pass legislation approving the compacts.

After passage of CR 115, the gaming compacts were subsequently considered approved when Secretary Babbitt failed to approve or reject them within 45 days. *See* 25 U.S.C. § 2710(d)(8)(C). The compacts were then published in the Federal Register and became effective under 25 U.S.C. § 2710(d)(3)(B).

## II. ANALYSIS

The threshold issue in this case is whether Baird and Peters have standing to sue based on their status as state legislators aggrieved by the state legislature's use of allegedly unconstitutional procedures. The district court found that Baird has standing but that Peters does not. Peters argues in this appeal that the district court erred in reaching this conclusion, but, for the reasons given below, the district court's conclusion regarding Peters was correct. In this appeal, Baird asserts that the district court properly found that she has standing because of her status as a state legislator, and the appellees have not disputed Baird's Article III standing. This court, however, is "under an independent obligation to examine" its own jurisdiction, and "standing 'is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)) (alteration in *FW/PBS*). Because we conclude that Baird, too, lacks Article III standing to sue, we do not have jurisdiction to consider the other issues raised in this appeal.

legislation.[6] As noted above, however, a deprivation of her "right[] to participate and vote on legislation in a manner defined by the [Michigan] Constitution" falls outside the scope of *Coleman* and *Raines* and, therefore, does not confer Article III standing. *See Chenoweth*, 181 F.3d at 115.

Based on the reasoning and citation of authority set forth above, I agree that Baird lacks Article III standing to challenge the actions of the Secretary of the Interior, but for reasons other than her failure to sue as part of a bloc.

---

[6] In *Saratoga County*, the state legislators had no opportunity to vote for or against the gaming compact, as Governor Pataki never presented it to them. In the present case, of course, Baird did participate in a vote on CR 115. However, given Baird's allegation that the vote on CR 115 was a nullity, because gaming compacts must be approved by legislation, she cannot be meaningfully distinguished from the state legislators in *Saratoga County*. In both cases, the alleged deprivation at issue is a loss of the right to vote on gaming compacts in the manner prescribed by state law.

does not inflict an injury-in-fact sufficient to confer Article III standing.

In conclusion, I note that the foregoing reasoning is consistent with *Saratoga County Chamber of Commerce, Inc. v. Pataki*, 712 N.Y.S.2d 687 (N.Y. App. Div. 2000), which was decided approximately three weeks after oral argument in the present case. In *Saratoga County*, New York state legislators and others sued Governor Pataki, alleging that he improperly entered into an Indian gaming compact, pursuant to the IGRA, without obtaining approval from the state legislature. The plaintiff legislators in *Saratoga County* were deprived of *any* opportunity to vote for or against the gaming compact, as Governor Pataki never presented the compact to the legislature at all. Upon review, the appellate court held that the legislators' alleged "injury"—denial of their right to vote on approval of the compact—was insufficient to confer "legislator standing" upon them.[5] In reaching this conclusion, the court reasoned that "their claim of standing is based on a loss of political power rather than the assertion that they have been deprived of something to which they personally are entitled." *Id.* at 695. With respect to the legislators' argument that Governor Pataki had acted improperly, the court noted that their claim did not "differentiate" them from the general public. *Id.* (citing, *inter alia*, *Raines v. Byrd*, 521 U.S. 811 (1997), and *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999)).

Likewise, Baird argues that the Secretary of the Interior acted unlawfully by endorsing the gaming compacts without obtaining valid approval from the Michigan legislature, as required by state law. As in *Saratoga County*, Baird complains that she was deprived of the opportunity to vote on

---

[5] While New York's standing requirements do not mirror the requirements of Article III, both New York law and Article III require an "injury in fact," and the analysis of that issue is essentially the same under New York and federal law. *See, e.g.*, *Soc'y of Plastics Indus., Inc. v. County of Suffolk*, 77 N.Y.2d 761, 772-773, 573 N.E.2d 1034 (N.Y. 1991).

Baird and Peters argue that they suffered two different injuries as a result of the secretary's failure to reject the compacts at issue. First, Baird and Peters argue that they have been injured by being deprived of the procedural safeguards required by the Michigan Constitution for the passage of legislation, such as the reading of proposed legislation three times and the requirement that the legislation be in the possession of both houses at least five days before any vote. *See* Mich. Const. 1963, art. IV, § 26. The district court correctly rejected these claimed injuries as insufficient to give the appellants standing in the present case. These constitutional measures are clearly designed to "preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration," *Anderson v. Oakland County Clerk*, 353 N.W.2d 448, 455 (Mich. 1984), and not to protect individual state legislators. Because of this denial of procedural safeguards, then, Baird and Peters have, at most, a generalized grievance shared by all Michigan residents alike. Such a grievance does not give them standing to sue. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share.").

Second, Baird and Peters argue that their votes were nullified by the state legislature's use of improper procedures in enacting the gaming compacts. Under certain circumstances, vote nullification may give legislators standing to challenge improper procedures. *See Raines v. Byrd*, 521 U.S. 811 (1997); *Coleman v. Miller*, 307 U.S. 433 (1939). But Baird and Peters have not suffered a vote-nullification injury sufficient to give them standing in the present case.

The leading case on legislator standing based on vote nullification is *Coleman v. Miller*. In *Coleman*, the Supreme Court held that a group of Kansas state senators had standing to sue when they claimed that their votes had been effectively nullified by the state legislature's use of an allegedly unconstitutional procedure. In voting on a proposed

constitutional amendment, the forty-member Kansas State Senate had divided evenly, with twenty Kansas state senators voting for ratification and twenty against. The Kansas lieutenant governor then cast the tie-breaking vote in favor, and the amendment was treated as ratified as a result. *See Coleman*, 307 U.S. at 436. The *Coleman* plaintiffs, including the twenty state senators who had voted against ratifying the amendment, claimed that the lieutenant governor's vote had been improper and unconstitutional and thus sought a writ of mandamus to compel state officials to recognize that the amendment had not been properly ratified. *See id.* The Supreme Court concluded that the *Coleman* plaintiffs had standing to challenge the procedure, based on the effective nullification of their votes, but held against them on the merits of their claim. *See id.* at 437, 456.

The Supreme Court recently clarified its holding in *Coleman* in *Raines v. Byrd*. *Raines* involved a challenge to the constitutionality of the Line Item Veto Act, Pub. L. No. 104-130, 110 Stat. 1200 (1996). Four senators and two House members brought the suit, claiming that the Act would reduce their voting effectiveness on future appropriations bills. *See Raines*, 521 U.S. at 814. The *Raines* plaintiffs relied heavily on *Coleman*'s suggestion that legislators have "a plain, direct, and adequate interest in maintaining the effectiveness of their votes." *Id.* at 825. The *Raines* Court rejected this broad reading of *Coleman*, however, holding that the legislators lacked standing because they had alleged no more than "the abstract dilution of institutional legislative power." *Id.* at 826. The Court distinguished the facts in *Raines* from those in *Coleman*, stressing that the six *Raines* plaintiffs had not alleged "that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated." *Id.* at 824. Instead, the *Raines* plaintiffs had simply voted against a bill, "their votes were given full effect" in that vote, but the bill was passed despite their nay votes. *Id.* In short, the *Raines* plaintiffs' complaint was that they had lost a vote and believed that the resulting legislation was unconstitutional,

*Id.* at 115.

In short, the *Chenoweth* court concluded that the legislators' alleged "injury in fact"—their loss of the right to vote on the river preservation program due to "the President's successful effort 'to usurp Congressional authority by implementing a program, for which [he] has no constitutional authority, in a manner contrary to the Constitution'"—was insufficient to confer Article III standing.[3] *Id.* at 116.

Likewise, in the present case, Baird contends that the Secretary of the Interior's endorsement of the gaming compacts, which occurred in the absence of legislation authorizing them, deprived her of the right to vote on the compacts in the manner prescribed by the Michigan Constitution. As in *Chenoweth*, however, her loss of the right to vote, as the result of allegedly unlawful executive action,[4]

---

[3] Although *Raines* and *Chenoweth* both involved federal legislators, the District of Columbia Circuit Court of Appeals has recognized that the reasoning underlying *Raines* applies equally to suits brought by state legislators. *See Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1337 (D.C. Cir. 1999).

[4] *Chenoweth* and the present case plainly both involve a challenge to allegedly unlawful executive action that deprived lawmakers of the right to vote. In *Chenoweth*, the plaintiffs argued that former President Clinton's issuance of an executive order for the protection of rivers deprived them of the right to vote on legislation proposing such protection, as required by the United States Constitution. *Chenoweth*, 181 F.3d at 115. Likewise, in the present case, Baird argues that the Secretary of the Interior's endorsement of the gaming compacts deprived her of the right to vote on legislation proposing the compacts, as required by the Michigan Constitution. In the present case, of course, the reason why the Secretary's endorsement of the compacts was allegedly unlawful is that proper *legislative* procedures were not followed prior to the Secretary's endorsement. The fact remains, however, that Baird's legal challenge, as in *Chenoweth*, is to allegedly unlawful *executive action*. This is apparent from the fact that she has named the Secretary of the Interior as the defendant, alleging, *inter alia*, that the gaming compacts the Secretary signed are unconstitutional. (*See, e.g.*, JA at 244, 246, 250).

in the form of legislation as opposed to the allegedly "null and void" concurrent resolution), her "injury" is insufficient to confer Article III standing. Baird complains that the Secretary's endorsement of the gaming compacts, subsequent to the passage of the concurrent resolution, deprived her of the opportunity to participate in a valid vote on legislation proposing the compacts, as required by the Michigan Constitution. It is evident, however, that such an injury falls outside the scope of *Coleman* and *Raines*. Indeed, as the District of Columbia Circuit Court of Appeals recently recognized in *Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000), a deprivation of the "right[] to participate and vote on legislation in a manner defined by the . . . Constitution" is insufficient to confer Article III standing.

In *Chenoweth*, the court held that members of Congress lacked standing to challenge the constitutionality of an Executive Order for the protection of rivers. The legislators in *Chenoweth* claimed that former President Clinton's creation of a river preservation program by Executive Order deprived them of "'their constitutionally guaranteed responsibility of open debate and vote on issues and legislation' involving interstate commerce, federal lands, the expenditure of federal monies, and implementation of the [National Environmental Policy Act]." *Id.* at 113. The district court dismissed the lawsuit for lack of standing, reasoning that the legislators' injury—the loss of their right to vote on the preservation program—was "too abstract and not sufficiently specific to support a finding of standing." *Id.* Upon review, the District of Columbia Circuit Court of Appeals affirmed. Relying upon *Raines*, the appellate court reasoned:

> If, as the Court held in *Raines*, a statute that allegedly "divests [congressmen] of their constitutional role" in the legislative process does not give them standing to sue, . . . then neither does an Executive Order that allegedly deprives congressmen of their "right[] to participate and vote on legislation in a manner defined by the Constitution."

but this was not a sufficient injury to give them standing to sue based on nullification.

The state legislators in *Coleman*, in contrast, had alleged a vote-nullification injury sufficient to give them standing to sue because, had these state senators been "correct on the merits," their votes would have been sufficient to defeat ratification. *See Raines*, 521 U.S. at 822-23. In this context, the *Raines* Court emphasized that the twenty Kansas state senators in *Coleman* "were suing as a bloc." *Id.* at 822. The *Raines* Court's summary of *Coleman* indicates that the aggregate nature of the state senators' claim was essential to their standing: "[O]ur holding in *Coleman* stands (at most) for the proposition that legislators whose votes would have been sufficient to defeat . . . a specific legislative Act have standing to sue if that legislative action goes into effect . . . , on the ground that their votes have been completely nullified." *Id.* at 823 (internal cross reference omitted).

For legislators to have standing as legislators, then, they must possess votes sufficient to have either defeated or approved the measure at issue. The present case is thus distinguishable from *Coleman*. In *Coleman*, the twenty state senators who voted against the proposed constitutional amendment would have been "sufficient" to defeat the measure had the lieutenant governor not voted. Thus, through the use of this allegedly improper procedure, the votes of the twenty state senators seeking relief were completely nullified, i.e., "overridden and virtually held for naught." *Coleman*, 307 U.S. at 438. In the present case, in contrast, the only member of the Michigan House of Representatives seeking relief is Baird. Baird claims vote nullification, but her vote alone would not have been sufficient to defeat either the concurrent resolution, which passed despite her "nay" vote, or legislation to similar effect. The Michigan Constitution may require a majority of all members' votes for legislation to be approved, but it does not require unanimity. *Cf. Raines*, 521 U.S. at 823 n.6 (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544-45 n.7 (1986)). Thus, although Baird's institutional power was diluted through the use of the continuing

resolution procedure, she has not suffered an injury that satisfies the stringent requirements for legislator standing set out in *Raines*. Similarly, State Senator Peters's vote was not nullified by the concurrent resolution procedure because the vote in the state senate satisfied the constitutional requirement of a majority of all members for the passage of legislation. Thus, Peters cannot argue that his vote was sufficient to defeat the passage of legislation having the same effect as CR 115.

Under *Raines*, however, if Baird's lawsuit had been joined by other members of the Michigan House of Representatives whose total votes (and non-votes) would have been sufficient to defeat the necessary legislation, then this group of lawmakers, like the twenty state senators in *Coleman*, would have had standing as legislators based on vote nullification. If, for example, Baird had been joined by eight of the fifteen members of the Michigan House who did not vote when CR 115 was passed, then their non-votes, coupled with the forty-seven votes actually cast against CR 115, would have been sufficient to defeat the legislation that Baird claims is constitutionally required — i.e., eight of the non-votes, plus forty-seven "nay" votes, effectively equals fifty-five votes against the measure under the Michigan Constitution's requirement that a majority of all votes is necessary to enact legislation.[2]

---

[2]This approach may appear counter-intuitive in its suggestion that non-votes can be effectively nullified through the use of improper procedures. In requiring a majority of all votes for the passage of legislation, however, the Michigan Constitution gives this effect to non-votes. Consider the following hypothetical. Counting noses, the proponents of a measure know that it is opposed by fifty-five of the 110 members of the Michigan House. Thus, they do not bring the measure to the floor as legislation but instead wait until the measure's supporters make up a majority of those present. When that happens, the measure's proponents bring it up as a concurrent resolution, even though the state constitution requires its passage by legislation, and it passes by a majority of votes cast. In this scenario, the non-votes have been effectively nullified, i.e., deprived of the effect that the Michigan Constitution grants them.

by the Michigan Constitution (i.e., she was deprived of the opportunity to vote on *legislation* proposing the compacts). In particular, she reasons that

> [b]y offering a concurrent resolution instead of legislation, the requirements of the Michigan Constitution were subverted. Had those requirements been honored, Appellant Legislators' "votes would have been decisive in defeating" the approval of the [gaming compacts]. *Coleman*, at 307 U.S. 441. Thus, just as in *Coleman*, the Appellant Legislators' votes here were rendered completely ineffective.

(Appellants' Brief at 12).

Upon review, I cannot agree with Baird's assertion that the present case is analogous to *Coleman*, particularly as it has been narrowly construed by *Raines*. As noted above, *Coleman* stands "at most" for "the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines,* 521 U.S. at 823 (footnote omitted). Under this test, Baird lacks standing. The only "specific legislative Act" or "legislative action" at issue in the present case is CR 115. Unlike the legislators in *Coleman*, Baird and the other opponents of the compacts lacked sufficient votes to defeat CR 115. Consequently, applying the language of *Raines*, it cannot be said that there were "sufficient votes" to defeat CR 115, but that it went into effect anyway, thereby nullifying the vote of Baird or the other opponents of the concurrent resolution. Consequently, even if Baird and her colleagues had sued as a bloc, they still would lack Article III standing. Contrary to Baird's assertion, the Secretary of the Interior's approval of the gaming compacts did not nullify anyone's vote.

Insofar as Baird suggests that the Secretary of the Interior unlawfully endorsed the gaming compacts without obtaining proper approval from the Michigan legislature (i.e., approval

because they had not alleged a sufficiently concrete injury.[2] In reaching this conclusion, the *Raines* Court read *Coleman* as standing "at most" for "the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (footnote omitted).

After restricting *Coleman* to the proposition set forth above, the *Raines* Court reasoned:

> It should be equally obvious that appellees' claim does not fall within our holding in *Coleman*, as thus understood. They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect. They simply lost that vote.

*Id.* at 824 (footnote omitted).

Likewise, in the present case, it is evident that Baird's claim does not fall within the scope of *Coleman*, as interpreted by *Raines*. Baird does not contend that she voted against CR 115, that there were sufficient votes to defeat CR 115, and that CR 115 nevertheless went into effect. To the contrary, Baird was plainly on the losing side with respect to the vote on the concurrent resolution. As in *Raines*, then, her vote was given full effect. She simply lost that vote.

Baird's true complaint is that she was deprived of the opportunity to vote on the compacts in the manner prescribed

---

[2]The plaintiff-appellees in *Raines* were members of Congress who had voted against the Line Item Veto Act, which passed in the Senate by a vote of 69 to 31 and in the House by a vote of 232 to 177. After former President Clinton signed the Act into law, six of the losing legislators filed suit, alleging that the Act was unconstitutional. *Raines*, 521 U.S. at 814.

In sum, Baird's complaint is not that the compacts themselves are unconstitutional. Instead, her complaint is that the compacts would have been defeated, had the constitutionally required procedures been followed, and thus her vote against the compacts was effectively nullified. Under *Raines* and *Coleman*, the issue is whether Baird can demonstrate that *her vote* was sufficient to defeat the compacts had the constitutionally required procedure been followed. Because Baird cannot do so, she lacks standing. Similarly, State Senator Peters lacks standing because he cannot show that his vote was sufficient to defeat the gaming compacts, had the proper procedure been followed.

### III. CONCLUSION

Because we conclude that neither Baird nor Peters has Article III standing in the present case, we lack jurisdiction to address the other issues raised in this appeal. For the reasons given above, the district court's dismissal of the present case is **AFFIRMED**.

---

**CONCURRENCE**

---

WALTER HERBERT RICE, District Judge, concurring. I concur in the judgment of the majority, but I write separately because I believe that Baird would lack standing even if this lawsuit had been joined by other members of the Michigan legislature. Unlike the majority, I do not believe that Baird's lack of standing stems from her failure to sue as part of a bloc. Rather, her lack of standing is attributable to the fact that her vote on CR 115 was given full effect. Although she was on the losing side, her vote was not in any sense "nullified." Baird's complaint is simply that a concurrent resolution was an improper way for the Michigan House of Representatives to approve the gaming compacts at issue. She contends that she should have received the opportunity to vote on legislation proposing the compacts. According to Baird, the Secretary of the Interior unlawfully endorsed the compacts, without obtaining the necessary approval of the state legislature,[1] thereby depriving her of the right to vote on them in the manner prescribed by the Michigan Constitution. Such an injury, however, is insufficient to confer Article III standing, with or without the presence of Baird's colleagues in this lawsuit.

The foregoing conclusion is consistent with, and mandated by, *Coleman v. Miller*, 307 U.S. 433 (1939), and *Raines v. Byrd*, 521 U.S. 811 (1997). In *Coleman*, 20 of 40 Kansas state Senators voted against ratification of a constitutional amendment. The Lieutenant Governor then cast a tie-breaking vote in favor of the amendment, which was ratified as a result of his vote. Thereafter, the 20 members of the Kansas Senate who had voted against the amendment sought a writ of mandamus from the Kansas Supreme Court to compel state

---

[1] Given her belief that a concurrent resolution is an unlawful way for the Michigan legislature to approve gaming compacts, Baird contends that CR 115 is null and void. (JA at 244, ¶30).

officials to recognize that the legislature had not ratified the amendment because the Lieutenant Governor should not have been permitted to vote. Upon review, the Kansas Supreme Court held that the legislators had standing to bring their mandamus action, but it ruled against them on the merits. The United States Supreme Court subsequently agreed, holding that the members of the legislature had standing. In reaching this conclusion, the *Coleman* Court noted that, if the legislators were correct on the merits, then their votes against ratification were nullified. In relevant part, the Court reasoned:

> Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

> [T]he twenty senators were not only qualified to vote on the question of ratification but their votes, if the Lieutenant Governor were excluded as not being a part of the legislature for that purpose, would have been decisive in defeating the ratifying resolution.

> [W]e find no departure from principle in recognizing in the instant case that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision.

*Coleman*, 307 U.S. at 438, 441, 446.

The Supreme Court subsequently read *Coleman* narrowly in *Raines*, holding that members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act