*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0413P (6th Cir.)
File Name: 01a0413p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>   *Plaintiff-Appellee,*<br><br>LEWIS G. MOSBURG, JR.,<br>   *Conservator-Appellee,*<br><br>*v.*<br><br>BASIC ENERGY & AFFILIATED RESOURCES, INC., *et al.*,<br>   *Defendants,*<br><br>JAMES C. BRUNACKEY (00-1088); JAMES D. ADDABO, *et al.* (00-1472),<br>   *Movants-Appellants.* | Nos. 00-1088/1472 |

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-74434—John Corbett O'Meara, District Judge.

Submitted: August 9, 2001

Decided and Filed: December 3, 2001

Before:  MOORE and COLE, Circuit Judges; FORESTER,
Chief District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:**  Walter L. Baumgardner, Jr., MUSILLI &
BAUMGARDNER, St. Clair Shores, Michigan, for
Appellants.  Douglas W. Van Essen, STENGER &
STENGER, Grand Rapids, Michigan, for Appellees.  James
C. Brunackey, Williamsburg, Michigan, pro se.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Holding itself
out to the investing public as an energy company, Basic
Energy and Affiliated Resources, Inc. ("BEAR") was actually
a Ponzi scheme, paying earlier investors out of funds raised
from subsequent investors.  Before the district court enjoined
BEAR's officers and agents on November 9, 1994 from
soliciting any additional investments, BEAR had successfully
bilked thousands of investors out of millions of dollars.  In
December 1994, at the request of the Securities and Exchange
Commission ("SEC"), the district court appointed Lewis G.
Mosburg, Jr. as conservator ("Receiver") and charged him
with marshaling BEAR's assets and devising a plan for the
disgorgement of the proceeds to BEAR's investors.  In May
1997 the district court approved the preliminary distribution
plan proposed by the Receiver, and in September 2000 the
district court finalized the distribution list and disgorgement
plan.  The present appeals involve BEAR investors'

_____

[*] The Honorable Karl S. Forester, Chief United States District Judge
for the Eastern District of Kentucky, sitting by designation.

a distribution plan that was fair and equitable.  Thus, we cannot conclude that the district court has abused its discretion.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's challenged orders regarding Brunackey and the Escrow Investors.

challenges to the district court's orders pursuant to this distribution plan.

In Case No. 00-1088, James Brunackey argues that the district court erred in classifying him as an "insubstantial marketer" under the classification scheme established in the distribution plan.  Instead, Brunackey argues that he should be classified as a "nonmarketer," i.e., as someone who never received any commissions for selling BEAR securities.  Under the distribution plan, nonmarketers are entitled to receive a greater percentage of their net contributions than are marketers.  Brunackey was classified as an insubstantial marketer by the district court because BEAR records indicated that he had received a $600 commission payment from BEAR.  Brunackey argues that this payment was actually a rebate and thus that he should be reclassified as a nonmarketer.  He was unable, however, to present any evidence that the payment at issue was in fact a rebate; thus, the district court's finding of fact cannot be said to have been clearly erroneous.  For this reason, we **AFFIRM**.

In Case No. 00-1472, twenty-two BEAR investors (hereinafter the "Escrow Investors") challenge the district court's order treating a Fleet Bank escrow account as a BEAR asset, to be distributed with the rest of BEAR's assets under the distribution plan.  This escrow account was established with funds that the Escrow Investors advanced *after* the district court had enjoined BEAR and its officers and agents from further soliciting of funds.  We **AFFIRM** the district court's order treating the escrow account as a BEAR asset. We conclude that the Escrow Investors were not denied due process and that the district court's finding that the escrow account was a BEAR asset was supported by the evidence.

### I. BACKGROUND

**Brunackey**, No. 00-1088.

Brunackey, a BEAR investor, appeals the order classifying him as an "insubstantial marketer."  Under the distribution

plan devised by the Receiver and approved by the district court, each BEAR investor is assigned an investment number, a net investor claim ("NIC"), and an adjusted NIC ("ANIC"). Each investment is assigned an NIC by subtracting any commission payments, interest payments, return of principal payments, or similar payments made by BEAR to that account from the aggregate investment. Investors are then classified into one of four categories: defendants, substantial marketers, insubstantial marketers, and nonmarketers. The ANIC for all defendants in the underlying SEC action is set at zero. Thus, defendants are not entitled to receive any percentage of their NICs as part of the distribution plan. The ANIC for a substantial marketer (defined as an investor who received more than $1,000 in commissions) is equal to his NIC reduced by ninety percent. Thus, substantial marketers are entitled to receive up to ten percent of their NICs as part of the distribution plan. The ANIC for an insubstantial marketer (defined as an investor who received commissions less than $1,000) is equal to her NIC reduced by fifty percent. Thus, insubstantial marketers are entitled to receive up to half of their NICs under the distribution plan. Finally, nonmarketers' NICs are not reduced, and thus they are potentially entitled to receive their entire NICs under the plan.

According to the preliminary investor list compiled by the Receiver (dated October 21, 1996), Brunackey's investments in BEAR totaled $192,000. Joint Appendix (J.A.) at 246. This appeal, however, involves only one of those investments, designated as No. 225 by the Receiver, worth $120,000. Brunackey received a return on this investment of $13,577. Thus, under the distribution plan, his NIC for this investment is $104,698. For No. 225, Brunackey was originally classified as a "substantial marketer," because the BEAR records indicated that two separate commission payments had been made to Brunackey on this account, one for $1,500 and the other for $600. Thus, his NIC for No. 225 was reduced by ninety percent, and Brunackey was only entitled to receive up to ten percent of this investment (approximately $10,470) under the distribution plan.

account. But if that is the case, then it is again unclear what the Escrow Investors expect to achieve in an evidentiary hearing in the district court.

In sum, the procedures used by the district court were well within the limits of that court's equitable discretion in such a case. The district court considered the evidence and arguments presented by the Escrow Investors' attorney at a motion hearing held before issuance of the 1996 transfer order. It provided the Escrow Investors with ample opportunities to rebut the Receiver's characterization of the facts and to present alternative characterizations. Moreover, the Escrow Investors have failed to demonstrate that the procedures followed prejudiced them.

This conclusion is supported by the Fifth Circuit's holding in *SEC v. Forex Asset Management LLC*, 242 F.3d 325 (5th Cir. 2001). After establishing its appellate jurisdiction, discussed *supra*, the *Forex* court went on to hold that the district court had not abused its discretion in determining that the investors' $800,000 should be treated the same as other Forex assets, despite its traceability. *See id.* at 331. The *Forex* court concluded:

> The district court carefully considered the [investors'] arguments and the position of the other fraud victims. Further, the district court determined that the facts did not support a remedy that would elevate the [investors'] claim above the other victims, and accordingly determined that a pro rata distribution would provide a fair and equitable remedy. Thus, the district court used its discretion in a logical way to divide the money, and, therefore, did not abuse its discretion in approving the plan.

*Id.* (citation and internal quotation marks omitted). Similarly, in the present case the district court carefully considered the Escrow Investors' arguments, the position of the other BEAR investors, and the facts of the case, and accordingly fashioned

The closest the Escrow Investors come to making a prejudice argument is in arguing that, in ruling on the transfer order, the district court relied heavily on the Receiver's reply brief, which, they claim, was not filed at least three days before the hearing. It is possible that, had this brief been filed at least three days before the hearing, the Escrow Investors might have been able to have more effectively rebutted the Receiver's arguments regarding whether the Fleet Bank escrow account was established by McClorey as a trust for the benefit of the Escrow Investors. The Escrow Investors' argument on this point is clearly tied to their due process claim: "the [district court] should have scheduled an Evidentiary Hearing to allow the Movants the opportunity to apprise the Court of Massachusetts law [regarding trusts]." Appellants' Br. at 16.

There are two ways to understand the Escrow Investors' argument on this point. First, the Escrow Investors could be arguing that the district court erroneously found that the escrow account was held by the Fleet Bank "for the benefit of BEAR" rather than for the benefit of the Escrow Investors. J.A. at 302 (Transfer Order, Findings of Fact). Under this reading, the Escrow Investors would not be challenging the district court's interpretation of Massachusetts law, but rather a factual finding. This particular finding is not clearly erroneous. The district court based this finding on the Escrow Agreement entered into by BEAR president Schouman and BEAR attorney McClorey and Smith of the Boston Group. *See* J.A. at 298-300. Although it is possible that the district court could have reached another conclusion on this particular point, given the existence of other documents regarding the escrow account, the district court appears to have concluded that the Escrow Investors were the final victims of BEAR's fraudulent schemes — a reasonable conclusion, given that the Escrow Investors' money was never returned to them. Second, the Escrow Investors might be arguing that the district court erred in interpreting Massachusetts law as requiring that the Escrow Investors be "identified by name as trust beneficiaries" in the records of the bank holding the

Proceeding pro se, Brunackey objected to his classification as a substantial marketer, and the matter was referred to Magistrate Judge Virginia M. Morgan. At the hearing, held in October 1998, Brunackey persuaded Judge Morgan that the $1,500 payment had been a rebate on an investment he had made. The $1,500 payment from BEAR to Brunackey was contemporaneous with his investment in a BEAR project and equaled four percent of that investment. Given these facts, Judge Morgan determined that this payment had in fact been a rebate on that investment. Brunackey was unable to present similar evidence regarding the $600 payment, however. At the hearing, he unsuccessfully argued that he had not marketed any BEAR programs and that the court should place greater weight on his oral testimony than on the records of BEAR. On this point, Judge Morgan's September 14, 1999 order states:

14. No evidence was presented that the $600 payment was contemporaneous with any investment. The payment is shown on the BEAR check ledger as a commission, which is confirmed by the commission sub-ledger. The Investors [Brunackey and other members of his family] have not sustained the burden of proof that such payment should not be considered a commission. Investor No. 225 should be classified as an Insubstantial Marketer.

J.A. at 298. After the district court approved this order, Brunackey filed a notice of appeal.

**The Escrow Investors**, No. 00-1472.

Even after the BEAR principals had consented to the preliminary injunction on November 9, 1994, which enjoined them from raising further funds on behalf of BEAR, a number of individuals contributed approximately $500,000 in an effort to maintain BEAR as a viable entity. This effort apparently involved an attempt by BEAR attorney Bernard McClorey and BEAR president Michael Schouman to secure

a seventy-five million dollar loan to make the defrauded BEAR investors whole. The current appeal involves the claims of twenty-two of these individuals, the Escrow Investors.

The funds at issue were deposited in an escrow account in the Fleet Bank in Massachusetts. This escrow account was subject to the terms of an escrow agreement, dated January 18, 1995, between Larry Smith, president of the Boston Group, the firm hired to find a lender for BEAR, and McClorey and Schouman, on behalf of BEAR. After thirty days, if an acceptable loan had not been secured for BEAR, the escrow agreement required that the $500,000 in the escrow account be returned to McClorey. In agreeing to forward these funds, the Escrow Investors had been promised that McClorey would return their money if an acceptable loan had not been secured within thirty days; in addition, McClorey and Schouman promised the Escrow Investors a ten-percent return on their deposits with McClorey.

Not surprisingly, no acceptable loan was found in the thirty-day period, and the Escrow Investors' funds were never returned. The release of the funds required the approval of both McClorey and Smith, and, for some reason, Smith failed to approve the release after the thirty-day period had expired. McClorey sued Smith in Michigan state court, seeking an order to Smith to show cause for failing to approve the release of the funds. McClorey's state complaint was filed on April 21, 1995.

Neither the Receiver nor the district court were aware of these events until May 1995, when an employee of the Receiver opened a letter from Fleet Bank to McClorey. (All BEAR mail was at that time being forwarded to the Receiver.) The Receiver quickly intervened in the state action, and in August 1985 the Michigan state court held that it lacked jurisdiction over the escrow account because it consisted of BEAR funds, which were under the federal court's jurisdiction.

> MR. MUSILLI: I understand[] [the Receiver's] counsel has said a lot of things, and counsel said a lot of things in the pleading, and I'm trying to advise the Court of what actually happened here. Within that 30 day period of time, those individuals, many of whom are sitting in the court and are prepared to tell the Court where they had to go to get that money, most of them borrowed that money.
>
> THE COURT: I understand. I have the greatest sympathy for them. You don't have to tell me whether they borrowed the money. I have the greatest sympathy.

J.A. at 397. This exchange suggests that the Escrow Investors would have testified to the sources of the funds that they invested in the escrow account. But the source of the funds is irrelevant to the district court's decision to treat the escrow account as a BEAR asset because that decision was based on the escrow documents. At the same hearing, Judge Gilmore summarized the facts of the case as he understood them:

> MR. MUSILLI: This court, then, without according [the Escrow Investors] due process is indicating that any money that they —
>
> THE COURT: I know what happened, they gave money to Mr. Schouman and Mr. McClorey who represented to them that they were officers and agents of BEAR, and this money was being — was needed to raise $500,000 so they could go, and they needed to raise that much to get a $75 million loan to pull BEAR out of the hole. And they said we'll give you ten percent per month on your money, and there's a period of 30 days. Then no one and none of the money was ever paid back in the 30-day period.

J.A. at 412. This summary of the facts was not controverted by the Escrow Investors' attorney. Similarly, at the conclusion of Musilli's argument, Judge Gilmore asked Musilli if he had anything else to present, to which Musilli replied, "That's enough, Your Honor." J.A. at 413.

the facts are in dispute and to make arguments regarding those facts." *Id.* at 1567. In addition, *Elliott* requires claimants to show "how they would have been better able to defend their interests in a plenary proceeding." *Id.* Using this standard, the *Elliott* court held that certain claimants in that case had been denied due process by the procedures the district court had adopted. For example, the court held that two claimants who had been denied the opportunity to present evidence on the nature of their transactions with the defendant and to present affirmative defenses should have been given an opportunity to rebut the receiver's characterization of their transactions and to present affirmative defenses. These claimants filed their objections with the court but were apparently never given a hearing or an opportunity to address the court directly. Instead, the procedures for the filing of objections adopted by the district court only involved "blank forms setting out the grounds for . . . objections." *Id.* at 1568.

In contrast, the district court in the present case has held at least two hearings to determine whether the transfer of the escrow account to the Receiver was appropriate. Although the Escrow Investors have not been provided with a full evidentiary hearing, they have been represented by counsel at motion hearings addressing their objections. The Escrow Investors' counsel has had ample opportunities to rebut the Receiver's characterization of the facts, which have subsequently been adopted by the district court.

Moreover, the Escrow Investors cannot demonstrate that they have been prejudiced by the lack of a full evidentiary hearing. It is not clear just what evidence the Escrow Investors would present if they were to be granted the requested evidentiary hearing. At the hearing on the transfer of the escrow account into the Receiver's account, held March 20, 1996, the Escrow Investors' attorney, Musilli, proposed that the court receive the testimony of some of the Escrow Investors. The proffered testimony, however, appeared to address the source of the funds that the Escrow Investors invested rather than the nature of the escrow account itself:

In January 1996, the Receiver moved the district court for an order to transfer the escrow account to the Receiver's account for distribution to the BEAR investors. This issue was briefed by the parties, including the Escrow Investors, and a hearing on the transfer of the escrow account to the Receiver was held before U.S. District Judge Gilmore on March 20, 1996. At this hearing, the Escrow Investors' attorney, Ralph Musilli, argued that the escrow account was not a BEAR asset. Musilli argued that the Escrow Investors were not, in fact, investors, but merely depositors who had put forward earnest money in an effort to secure a loan for BEAR. The district court rejected this account of the facts. On the issue of whether the Escrow Investors were in fact investors, the district judge emphasized that, under the terms of their agreement with McClorey, the depositors were to receive ten-percent interest on their deposits every thirty days. This weighed in favor of a finding that the Escrow Investors were in fact investing in BEAR rather than putting up earnest money on BEAR's behalf. The district judge also questioned Musilli about the motives of the Escrow Investors, most of whom had marketed BEAR programs in the past. In addition, the district judge apparently interpreted McClorey's failure to return the money to the investors after thirty days as evidence of yet another BEAR swindle.

On April 2, 1996, the district court issued the transfer order. The district court held that, as the term of the escrow agreement had lapsed, "BEAR ha[d] absolute title, free of [all] claims" to the $500,000. J.A. at 302 (Transfer Order). Under the terms of the transfer order, the Escrow Investors were to be treated the same as any other BEAR investors; thus, they would ultimately receive a distribution from BEAR's total asset pool, if they were otherwise entitled to a distribution under the distribution plan. The district court created a separate procedure, however, for those Escrow Investors who could show "that they were completely and totally innocent and had no knowledge of the [SEC's] litigation against [BEAR] and that they were not marketers for any [BEAR] programs." J.A. at 303. Two investors

attempted to meet this burden, but the district court subsequently found that both had been aware of the SEC litigation at the time of their investments. A majority of the Escrow Investors, in fact, were classified as BEAR marketers under the distribution plan eventually adopted.

The Escrow Investors appealed the transfer order to the Sixth Circuit, but the appeal was dismissed for lack of jurisdiction on November 29, 1996. At that time, this court held that the transfer order was not an appealable final judgment, an appealable interlocutory order, or an appealable collateral order.

On May 2, 1997, the district court issued another order involving the escrow account funds. The district court docket described this order as "regarding establishment of Preliminary Procedure for Determination of BEAR Investor Claim and for Plan of Initial Distribution of Disgorgement Proceeds." J.A. at 78. This distribution order adopted the distribution plan proposed by the Receiver. The distribution order also reiterated that the Escrow Investors would be treated in the same manner as all other BEAR investors, unless the Escrow Investors could demonstrate that they had been unaware of the SEC litigation at the time of their investment. In addition, this distribution order established procedures for the referral of objections to Magistrate Judge Morgan. The distribution order indicated that an initial distribution of $3,300,000 would be made after the Receiver had finalized the investor lists and "after entry of a final order by the Court." J.A. at 317.

Despite its tentative nature, the Receiver argues that this order, unlike the 1996 transfer order, was a final appealable order. The Escrow Investors did not appeal the 1997 distribution order, however. Instead, the Escrow Investors returned to the district court in October 1999, filing a motion for a hearing to argue for a revision of the 1996 transfer order and for certification under Federal Rule of Civil Procedure 54(b). The Escrow Investors persisted in their argument that

of the funds for the escrow account was one final swindle by BEAR's officers, including its president, Schouman. In light of this conclusion, the district court's decision to treat the Escrow Investors in the same manner as all other swindled BEAR investors makes a great deal of sense. As the Supreme Court noted in the original Ponzi case, such cases "call strongly for the principle that equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924).

The challenged order clearly falls within the "broad powers and wide discretion" that a district court may utilize in fashioning relief in an equity receivership proceeding. *Elliott*, 953 F.2d at 1566. This discretion, which "derives from the inherent powers of an equity court to fashion relief," makes the use of abbreviated, summary processes possible. *Id. See also SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) ("Once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement . . . ."). Such abbreviated procedures (including the use of a single receivership proceeding to resolve all claims) advance the government's interest in judicial efficiency by reducing the time needed to resolve disputes, decreasing the costs of litigation, and preventing the dissipation of the receiver's assets. *Elliott*, 953 F.2d at 1566 (citing *SEC v. Wencke*, 783 F.2d 829, 837 (9th Cir.), *cert. denied*, 479 U.S. 818 (1986); *United States v. Arizona Fuels Corp.*, 739 F.2d 455, 460 (9th Cir. 1984)).

In exercising its equitable discretion, however, the district court must still provide the claimants with due process. The Escrow Investors also argue that the district court's issuance of the 1996 transfer order violated their due process rights. We conclude, however, that the Escrow Investors in the present case received due process.

The *Elliott* court, after surveying the case law on due process in the SEC receivership context, concluded that "a district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when

approved this finding in a subsequent order. As a result of this finding, Brunackey was classified as an insubstantial marketer, according to the 1997 distribution order. This finding was not clearly erroneous. The magistrate judge based this finding on the BEAR check ledger, which described the $600 payment as a commission, and the commission sub-ledger. Brunackey was unable to offer any evidence, other than his own testimony, that the payment was a rebate.

Representing himself, Brunackey argues that the court below should not have placed any weight on the records of BEAR, given BEAR's history of fraud. The lower court's reliance on BEAR's records was reasonable, however, especially considering the practical difficulties that would follow from any effort to reconstruct BEAR's transactions from the testimony of those defrauded by BEAR. Because we are unable to conclude that the district court's conclusion was in error, we affirm the district court's order classifying Brunackey as an insubstantial marketer for investment No. 225.

**2. The District Court Did Not Deny the Escrow Investors Due Process and Did Not Abuse Its Discretion in Deciding to Treat the Escrow Investors in the Same Manner as the Other BEAR Investors.**

The Escrow Investors' argument on the merits is essentially that the district court erred in holding that the $500,000 in the Fleet Bank escrow account was a BEAR asset and thus in ordering the transfer of these funds to the Receiver's account for distribution to the BEAR investors. On one level, then, the issue is whether the district court erred in finding, as a factual matter, that the Fleet Bank escrow account was a BEAR asset. Given the language of the Escrow Agreement between Smith and the BEAR officers, however, it cannot be said that this factual determination was clearly erroneous. The district court appears to have concluded that the raising

the escrow account was not a BEAR asset and thus that the district court had erred in approving the transfer order. At the motion hearing on March 6, 2000, Magistrate Judge Morgan agreed with the Receiver that the 1997 distribution order had been a final appealable order. Judge Morgan issued an order on March 13, 2000, denying the Escrow Investors' motion. The Escrow Investors filed a notice of appeal of that order on April 12, 2000.

Subsequently, the district court issued an order on September 28, 2000, approving the proposed final investor list and distribution of disgorgement proceedings. Neither the Escrow Investors nor Brunackey filed a notice of appeal of that order.

## II.  ANALYSIS

**A. Given the District Court's Subsequent Final Distribution Order, the Appeals in the Present Case Are Timely.**

The Receiver argues that we lack jurisdiction to consider this case because the Escrow Investors failed to file a timely appeal of the final order in this case, which the Receiver identifies as the May 1997 distribution order.[1] We conclude, however, that the May 1997 distribution plan was not a final appealable order.

"A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S.

---

[1] The finality issue applies to Brunackey's appeal, as well. Brunackey appeals the district court's overruling of his objection to his classification as an insubstantial marketer. But this order is not, on its face, a final appealable order. It resembles the 1996 transfer order, which we previously held was not an appealable order. As is the case for the Escrow Investors, however, we have jurisdiction to hear Brunackey's appeal after the district court's final distribution order, as we explain *infra*.

229, 233 (1945). The May 1997 distribution order, however, left a number of matters to be resolved before the "judgment," i.e., the distribution, could be executed. Most importantly, the order did not include a final investor list, but instead established procedures for the referral of objections by investors. In this regard, the order clearly contemplated a subsequent *final* decision: "Once all referrals are completed, the Court shall receive a finalized investor list which shall constitute *a final and binding determination of the investors* and the amount of their claims for purposes of this proceeding." J.A. at 314 (emphasis added). Similarly, the May 1997 order concludes with the following two sentences, which clearly indicate that the district judge did not treat the order as a final decision: "This Order shall be sent to all investors or their attorneys who filed objections prior to the December 17, 1996 hearing. The final order shall be sent to all BEAR investors." J.A. at 317. Moreover, the district court docket described the May 1997 order as "regarding establishment of Preliminary Procedure for Determination of BEAR Investor Claim and for Plan of Initial Distribution of Disgorgement Proceeds." J.A. at 78.

The Receiver argues, however, that the May 1997 distribution order was final with respect to the issue on appeal, i.e., the transfer of the $500,000 escrow account into the Receiver's general account and the decision to treat the Escrow Investors as BEAR investors under the plan. The Receiver cites *United States v. Christunas*, 126 F.3d 765 (6th Cir. 1997), for the proposition that even a preliminary order can be a final, appealable order when that preliminary order terminates all issues presented with respect to a particular party and leaves nothing to be done except for the execution of the judgment with respect to that individual. In *Christunas,* an individual convicted of drug charges filed an appeal in 1996 challenging a final order of criminal forfeiture. This appeal was filed almost two years after the preliminary forfeiture order had been issued. We determined that the preliminary forfeiture order had been final with respect to Christunas in 1994, although it had not been final with respect

Moore, Moore's Federal Practice ¶ 204.14, at 983 (2d ed. 1975)); *see also Gillis v. Dep't of Health and Human Servs.*, 759 F.2d 565, 569 (6th Cir. 1985) (holding that an interlocutory appeal lacking Rule 54(b) certification invokes appellate jurisdiction when judgment becomes final prior to disposition of the appeal, even where a second notice of appeal has not been filed).

We hold that we have jurisdiction to hear the present case. An appealable order has been issued by the district court. Brunackey and the Escrow Investors have clearly manifested an intention to appeal the orders in question, as those orders are embodied in the district court's final investor list. Moreover, the Receiver can show no prejudice from having to address these appeals. Thus, the premature filing of the appellants' notices of appeal does not deprive this court of jurisdiction in the present case.

This conclusion is consistent with this court's previous order rejecting the Escrow Investors' appeal of the 1996 transfer order. Under the reasoning offered *supra*, the transfer order was neither a final order nor an appealable collateral order. Given the equitable powers of the district court in receivership proceedings, the district court could have, at any time between issuing the transfer order and its final plan, determined to treat the Escrow Investors differently. The final distribution plan, however, was an appealable collateral order because it conclusively determined the rights of the Escrow Investors and Brunackey with respect to the disputed funds, was separate from the merits of the SEC's complaint against BEAR, and would be unreviewable on appeal of the underlying SEC action.

**B. The Parties' Claims on the Merits**

**1. The Classification of Brunackey as an Insubstantial Marketer Was Not Clearly Erroneous.**

The magistrate judge found that Brunackey received a $600 commission payment from BEAR, and the district court

proceeding conducted by a district court, sitting in equity, with the assistance of an SEC-recommended receiver. *Elliott* does not address the basis of the court's jurisdiction, but it is noteworthy that the *Elliott* claimants appealed only after the district court had issued an "Order Establishing Final Plan for Distribution of Assets." *Id.* at 1566. The *Elliott* Final Plan differed from the May 1997 distribution plan at issue in this case in more than name, however. The *Elliott* distribution plan was issued only *after* the claimants' objections had been heard by the court, rather than before, as in the present case, and included findings addressing objections. Along these lines, the *Elliott* court noted just how few appeals it had to decide:

> One thousand eight hundred and ninety (1890) claims were filed by one thousand sixty-two (1,062) claimants. This was not an easy receivership to administer . . . .
>
> In this context, the Receiver and subsequently the district court were called upon to distribute the remains of Elliott's assets. In the end, of the many claimants, only twenty-seven claimants appealed on ten issues, of which we reverse four.

*Id.* at 1583-84.

Neither the Escrow Investors nor Brunackey has filed a notice of appeal from the district court's September 28, 2000 order. *Forex* suggests that we have jurisdiction to hear appeals of that order by the Escrow Investors, and Brunackey, under the collateral order doctrine. However, Brunackey and the Escrow Investors filed their notices of appeal *prior to* the issuance of that order, and neither has filed a second notice of appeal. This court has held, nonetheless, that "'an appeal should not be dismissed because it was technically premature if in fact an appealable judgment or order was rendered below, the appellant clearly manifested his intent to appeal from it and the prevailing party below can show no prejudice resulting from the prematurity of the notice.'" *Jackson v. TVA*, 595 F.2d 1120, 1121 (6th Cir. 1979)(quoting 9 J.

to third-party claims to the seized properties until 1996. *Id.* at 768-69. As a result, we concluded that the appeal was untimely and thus the court lacked jurisdiction to review the forfeiture order. *Id.* at 769.

The present case, however, presents facts very different from those in *Christunas*. *Christunas* involved a criminal forfeiture, a different, and, in many respects, much simpler, process than the complex disgorgement proceeding at issue in the present case. Moreover, in *Christunas* we relied heavily on a 1996 amendment to the Federal Rules of Criminal Procedure, which "makes . . . clear that a forfeiture order, whether preliminary or final as to third-party claims, is a final order as to the defendant." *Id.* at 768 n.1. There is no such clarifying rule in the context of disgorgement proceedings. Most important, the May 1997 distribution plan was not "final" even with respect to the Escrow Investors, as it established a procedure by which individual Escrow Investors could remove themselves from the general pool by demonstrating that they were unaware of the ongoing SEC litigation at the time of their investment in the escrow account. By contrast, the preliminary order in *Christunas* had a more "final" effect: "the actual effect of a preliminary forfeiture order is clearly that of a final order as to the defendant." *Id.* at 768.

Thus, even though the Receiver is incorrect in asserting that 1997 Order was a final order, we would still lack jurisdiction if there has not yet been an appealable order in this case. We conclude, however, that the district court issued an appealable order in this case on September 29, 2000, after the present appeals were filed. The docket describes this order as "approving amended proposed final list and distribution of disgorgement proceedings."

There is persuasive authority for the proposition that this September 29, 2000 order is an appealable collateral order. The Fifth Circuit addressed a factually similar case in *SEC v. Forex Asset Management LLC*, 242 F.3d 325 (5th Cir. 2001).

In that case, the SEC brought an enforcement action against Forex, which, like BEAR, had engaged in a scheme to defraud investors. Forex's assets were frozen and a receiver was appointed. *See id.* at 327-28. The *Forex* receiver, like the Receiver in the present case, marshaled the assets of the fraudulent entity and prepared a distribution plan. *See id.* at 328. Two Forex investors objected to the plan because it proposed to treat them in the same manner as all other Forex investors for distribution purposes, even though $800,000 of what they had invested in Forex had been deposited in a separate account and was thus still traceable at the time Forex's assets were frozen. The *Forex* district court considered the investors' objections but denied relief; thus, the $800,000 at issue was added to the general pool, to be distributed to Forex investors generally. *See id.* The district court subsequently approved the receiver's plan, and the investors appealed.

The *Forex* court considered two threshold issues before considering the merits of the investors' appeal. First, the *Forex* court determined that the investors had standing to appeal, even though they were not parties to the underlying SEC enforcement action and had not sought to intervene below. *See id.* at 329. The litigants in the present case have not raised the issue of the movants' standing to appeal the orders of the district court, but we raise this issue, *sua sponte*, because we are under an independent obligation to police our own jurisdiction. *See Baird v. Norton*, 266 F.3d 408, 410 (6th Cir. 2001). We have held previously that a non-party litigant has standing to appeal from an order entered in a federal receivership action if that litigant satisfies the standard for standing to appeal an order of a bankruptcy court. *Fidelity Bank, Nat'l Ass'n v. M.M. Group, Inc.*, 77 F.3d 880, 882 (6th Cir. 1996). "To appeal from an order of the bankruptcy court, appellants must have been directly and adversely affected pecuniarily by the order. This principle, also known as the 'person aggrieved' doctrine, limits standing to persons with a financial stake in the bankruptcy court's order." *Id.* (citations omitted). The litigants in the present case have

standing to appeal under this standard, as they have a clear financial stake in the challenged orders.

Second, the *Forex* court determined that it had jurisdiction to hear the case because the district court's approval of the distribution plan was an appealable collateral order. The collateral order doctrine, which was established in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), authorizes appellate review of an order when it "fall[s] in that small class [of orders and decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546. The *Forex* court went on to discuss the three requirements that an order must satisfy to fall within the collateral order rule, as established in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978): "[T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." The district court's distribution plan, the *Forex* court reasoned, "conclusively determine[d] the manner in which the receivership assets should be distributed." *Forex*, 242 F.3d at 330. Next, the *Forex* court concluded that the "distribution of the assets" was "separate from the merits of the SEC's complaint against Forex." *Id.* Finally, the distribution plan would be unreviewable on final appeal "because the assets from the receivership will be distributed, and likely unrecoverable, long before the action brought by the SEC is subject to appellate review." *Id.*

The Eleventh Circuit's opinion in *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992), *rev'd in part*, 998 F.2d 922 (11th Cir. 1993), suggests a similar approach. As with *Forex*, the underlying facts of *Elliott* are similar to those in the present case. The *Elliott* defendants had conducted an enormous Ponzi scheme and defrauded hundreds of investors. *Id.* at 1565. As in the present case, *Elliott* involved a disgorgement