Markman, J.
(concurring in part and dissenting in part). I respectfully dissent from the lead opinion, except as to part VI thereof, in this declaratory action in which we granted leave to appeal to consider: (1) whether the tribal-state gaming compacts at issue, entered into and signed by various Indian tribes and *362 Governor Engler on behalf of the state pursuant to the federal Indian Gaming Regulatory Act, 25 USC 2701 et seq., constitute “legislation” such that Michigan’s Legislature violated Const 1963, art 4, § 22 when it approved them by resolution rather than by bill; (2) whether the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the separation of powers doctrine; and (3) whether the compacts violate Const 1963, art 4, § 29, the “local acts” clause.
Regarding the first issue, the circuit court concluded that the compacts constitute legislation and, therefore, the Legislature was required to adopt them by bill. The" Court of Appeals disagreed and reversed the decision of' the circuit court. In my judgment, the compacts constitute legislation and, therefore, the Legislature violated art 4, § 22 when it adopted them by a resolution vote. Accordingly, I dissent from the lead opinion, and I would reverse the decision of the Court of Appeals on this issue and reinstate the decision of the circuit court.
Regarding the second issue, the circuit court concluded that the compacts violate art 3, § 2. The Court of Appeals reversed the decision of the circuit court on the basis that this issue was not ripe for review because the Governor had not yet attempted to amend the compacts. However, Governor Granholm recently sought to amend one of the four compacts and, therefore, in my judgment, this issue is ripe. I conclude that the amendatory provision violates art 3, § 2 and, therefore, I dissent from the lead opinion on this issue.
Regarding the third issue, the circuit court concluded that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the decision of the circuit court. I concur with the analysis set forth in part VI of the lead *363 opinion finding that art 4, § 29 is not implicated and, accordingly, I would affirm the decisions of the lower courts on this issue.
i. background
In California v Cabazon, 480 US 202; 107 S Ct 1083; 94 L Ed 2d 244 (1987), the United States Supreme Court considered whether California could legally enforce its regulatory gambling laws on Indian reservations if the state did not completely prohibit such gambling.[1] While the Court affirmed that it “has consistently recognized that Indian tribes retain ‘attributes of sovereignty over both their members and their territory,’ . . . and that ‘tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,’ ” it also acknowledged that “[i]t is clear ... that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided.” Id. at 207.[2] Thus, the question to resolve in Cabazon was whether the Congress had expressly provided that state laws that regulate, but do not prohibit, gambling may be applied on Indian reservations. The Court answered that question in the negative and, accordingly, held that California had no legal right to enforce those laws on reservations.
In response to Cabazon, the Congress, in 1988, passed the Indian Gaming Regulatory Act, 25 USC 2701 *364 et seq. (IGRA). The United States District Court for the District of South Dakota in Cheyenne River Sioux Tribe v South Dakota, 830 F Supp 523, 526 (D SD, 1993), aff'd 3 F3d 273 (CA 8, 1993), stated:
The IGRA was enacted in response to the Supreme Court’s decision in Cabazon. Congress wished to give states a certain amount of input into gambling on Indian reservations. S. Rep. No. 446, 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. 3071.
The IGRA gives states the right to get involved in negotiating a gaming compact because of the obvious state interest in gaming casino operations within the state boundaries ....[3]
IGRA divides gaming activities into three classes. Class I gaming consists of “social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations.” 25 USC 2703(6). Class II gaming includes bingo and card games —other than banking card games — that are played in conformance with state laws and regulations regarding hours of operation and limitations on wagers or pot sizes. 25 USC 2703(7). Class III gaming includes all other forms of gambling. 25 USC 2703(8).
*365 At issue in this case is class III gaming, referred to throughout the remainder of this opinion as “gambling” or “casino gambling.” 18 USC 1166 provides a starting point to IGRA as it relates to gambling. It states:
(a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.
(b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.
(c) For the purpose of this section, the term “gambling” does not include—
(1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or
(2) class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under [25 USC 2710(d)(8)] of the Indian Gaming Regulatory Act that is in effect.
(d) The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country....
Thus, IGRA generally provides that in the absence of a tribal-state compact, for purposes of federal law, all state gambling laws, including regulatory, as well as prohibitory, laws and regulations and any relevant criminal punishments, apply on Indian land just as they *366 apply elsewhere in the state, albeit with the proviso that criminal prosecutions are within the jurisdiction of the federal government.[4]
If a tribe wishes to “opt-out” of the default federal law rule of § 1166 and to lawfully engage in casino gambling on its Indian land, it may do so in accordance with 25 USC 2710(d) of IGRA. That section provides, in relevant parts:
(1) Class III gaining activities shall be lawful on Indian lands only if such activities are—
(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
*367 (3) (A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.[5]
(C) Any Tribal-State compact negotiated under sub-paragraph (A) may include provisions relating to—
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
(v) remedies for breach of contract;
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
*368 (vii) any other subjects that are directly related to the operation of gaming activities.
(5) Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal — State compact entered into by the Indian tribe under paragraph (3) that is in effect.
Thus, under § 2710(d), a state and a tribe are encouraged to negotiate with one another with the ultimate goal of entering into a mutually agreeable tribal-state compact that makes gambling on that tribe’s lands lawful and that may alter the general gambling laws and regulations and enforcement procedures that otherwise apply to that tribe through § 1166.
In essence, by providing under § 1166 that, in the absence of a compact, state gambling laws and regulations apply on Indian land, the Congress provided the consent to the states that was found lacking in Cabazon to regulate tribal gambling in the same manner and to the same extent that states regulate gambling elsewhere within their borders.[6] However, to maintain the *369 proper balance between Indian and state affairs, the Congress further provided under § 1166 that the federal government is charged with enforcing state criminal gambling laws and regulations on Indian land.
This point was succinctly made by the United States Court of Appeals for the Ninth Circuit in Artichoke Joe’s California Grand Casino v Norton, 353 F3d 712, 721-722 (CA 9, 2003). There, the court addressed the role of IGRA and, of particular relevance, 18 USC 1166, insofar as that provision grants states the power to generally regulate gambling on Indian land. The court stated:
IGRA changed the landscape .... [I]t devised a method to give back some of the regulatory [italics in original] authority that the Supreme Court had held inapplicable to Indian lands in Cabazon. One of the bases of the holding in Cabazon was that Congress had not explicitly ceded regulatory authority for gaming to the states in Public Law No. 280 or otherwise. IGRA responded by creating a statutory basis for gaming regulation that introduced the compacting process as a means of sharing with the states the federal government’s regulatory authority over class III gaming. Simultaneously, IGRA put into effect 18 USC 1166, which provides that “all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.” 18 USC 1166(a). The federal government retained the power to prosecute violations of state gambling laws in Indian country, so as to preserve the delicate balance of power between the States and the tribes. However, the fact that the federal government retained that power does not change the fact that California may enact laws and regulations concerning gambling that have an effect on Indian lands via *370 § 1166. [Artichoke Joe’s, supra at 721-722 (citations omitted; emphasis added).][7]
Moreover, through § 2710(d), the Congress provided the states with a direct means of “escaping] the preemptive force of federal and tribal interests”[8] regarding class III gaming on Indian land by granting states the power to specifically make lawful and regulate casino gambling on particular Indian land, as long as such actions arise from the negotiation process and are otherwise in accordance with IGRA.
In 1993, Governor Engler, pursuant to § 2710(d) of IGRA, entered into tribal-state compacts with seven Michigan tribes that were already conducting class HI gambling before the Congress’s passage of IGRA.[9] As required by the terms of a consent judgment that resolved a federal lawsuit filed by the tribes against the Governor to compel negotiations, the compacts were approved by the Legislature by resolution and became effective.[10] Additional state court litigation followed in *371 which the Michigan Court of Appeals twice confirmed that the Governor did not violate the separation of powers clause by binding the state to tribal-state compacts where the Legislature had approved those compacts by resolution. Thus, the Court of Appeals implied that mere resolution approval by the Legislature of tribal-state compacts was proper. See McCartney v Attorney General, 231 Mich App 722, 728; 587 NW2d 824 (1998); Tiger Stadium Fan Club v Governor, 217 Mich App 439; 553 NW2d 7 (1996).
The compacts at issue in this case were first signed by Governor Engler and each of four different Indian tribes in January of 1997.[11] Each compact was to take *372 effect, according to a compact provision, after “[e]ndorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature.”[12] The compacts were modified and re-executed in December 1998, and the Legislature proceeded to consider them by resolution. See HCR 115 (1998). Unlike a bill, which must be passed by a majority of elected and serving members of the Legislature, a resolution may be passed by a majority vote of those legislators present at the time, as long as a quorum is present. The House of Representatives approved the compacts by a resolution vote of 48 to 47, and the Senate followed suit by a resolution vote of 21 to 17.
Following is a list of the essential compact terms:
• The compacts permit a variety of gambling activities.
• The compacts provide that the tribe and the Governor may subsequently agree to expand the list of class in gaming activities permitted by the compacts.
• The compacts provide that the tribe shall “enact a comprehensive gaming regulatory ordinance” but if any regulation imposed by the tribe is less stringent than that imposed by the compact, the compact governs.
• The compacts provide that the tribe shall have responsibility to administer and enforce applicable regulatory requirements.
• The compacts provide limitations on the tribe’s hiring practices, for example, the tribe may hire no one under age 18 (whereas non-Indian casinos, in Michigan may employ only those who are 21 or older).
*373 • The compacts allow persons aged 18 and over to gamble (whereas the age requirement in the rest of Michigan is 21).
• The compacts incorporate the protections of the Michigan Employment Security Act, MCL 421.1 et seq.; and the Worker’s Disability Compensation Act of 1969, MCL 418.101 et seq.
• Any disputes between the tribe and the state are to be resolved through binding arbitration.
• The tribe must post a sign in the gaming facility noting that the facility “is not regulated by the State of Michigan.”
• The compact is binding for a period of twenty years after it becomes effective.
• The tribe must make semi-annual payments of 8% of the net win at the casino to the Michigan Strategic Fund.
• The tribe must make semi-annual payments of 2% of the net win to the treasurer of the relevant county to be held by the treasurer on behalf of the Local Revenue Sharing Board. To this end, counties in the vicinity of the class in gaming facilities shall create a Local Revenue Sharing Board.
• The compacts contain a provision that purports to empower the Governor to amend them without legislative approval.
Various lawsuits were filed questioning the validity of the 1998 compacts. The Sault Ste. Marie Tribe of Lake Superior sued in federal court to enjoin the operation of the new casinos, but the United States Court of Appeals for the Sixth Circuit dismissed this suit on standing grounds. Sault Ste Marie Tribe v United States, 288 F3d 910 (CA 6, 2002). Two state legislators also challenged the approval of Michigan’s 1998 compacts by the Secretary of Interior, which suit was also dismissed on *374 standing grounds by the United States Court of Appeals for the Sixth Circuit. Baird v Norton, 266 F3d 408 (CA 6, 2001).
Plaintiffs-appellants, the Taxpayers of Michigan Against Casinos and Laura Baird, filed this suit against Michigan in the Ingham Circuit Court seeking a declaratory judgment that the compacts do not comport with various constitutional provisions. Plaintiffs contend first that the compacts amount to legislation and, therefore, pursuant to Const 1963, art 4, § 22 the Legislature was required to adopt them by bill rather than approve them by resolution. The circuit court held that the compacts should have been approved by bill. The Court of Appeals reversed the circuit court decision, concluding that the compacts do not constitute legislation because they contain no enforcement provision that would ensure that their terms are satisfied and because the power of the state to legislate in this area is preempted by federal law. The Court of Appeals opined that the compacts constitute mere contracts and, therefore, approval by resolution was not constitutionally infirm. Plaintiffs also contend that the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the “separation of powers” doctrine. The circuit court agreed with plaintiffs. The Court of Appeals, however, reversed the decision of the circuit court on the basis that the amendatory provision issue was not ripe for review because the Governor had not yet attempted to amend the compacts. Plaintiffs additionally contend that the compacts violate Const 1963, art 4, § 29, the “local acts” clause. The circuit court disagreed, holding that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the circuit court on this issue.
*375 II. STANDARD OF REVIEW
Matters of constitutional and statutory interpretation are reviewed de novo by this Court. Harvey v Michigan, 469 Mich 1, 6; 664 NW2d 767 (2003); Roberts v Mecosta Co Gen Hosp, 466 Mich 57, 62; 642 NW2d 663 (2002).
III. ANALYSIS
This Court has been called upon to consider, in this action seeking declaratory judgment, matters of significant constitutional concern. We are asked to consider whether the challenged tribal-state compacts and various actions undertaken by our legislative and executive branches of government pertinent to those compacts are consistent with the enactment requirement, the separation of powers doctrine, and the local acts provision embodied in Michigan’s Constitution. “[D]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.” House Speaker v Governor, 443 Mich 560, 575; 506 NW2d 190 (1993).
A. DO COMPACTS CONSTITUTE “LEGISLATION”?
The first question presented on review requires that we consider whether the tribal-state compacts at issue constitute “legislation.” The Michigan Constitution requires that “[a]ll legislation shall be by bill. . ..” Const 1963, art 4, § 22. In addition, “[n]o bill shall become a law without the concurrence of a majority of the members elected to and serving in each house.” Const 1963, art 4, § 26. Plaintiffs contend that the compacts constitute legislation and, therefore, the Legislature was *376 required to approve them by bill — by a majority vote of the members elected to and serving in each house. Defendants contend that the compacts do not constitute legislation and instead are contracts of a unique nature that the state may validly enter into pursuant to federal law as provided in IGRA, and, therefore, the compacts are not subject to Const 1963, art 4, §§ 22 and 26.
Black’s Law Dictionary (7th ed) defines “legislation” as “[t]he process of making or enacting a positive law in written form, according to some type of formal procedure, by a branch of government constituted to perform this process-Also termed lawmaking . . . .” Michigan’s Constitution provides that “[t]he legislative power of the State of Michigan is vested in a senate and a house of representatives.” Const 1963, art 4, § 1. Thus, the branch of government “constituted to perform [the lawmaking] process” is the Legislature, and the “formal procedure” by which this process is to occur is constitutionally defined — lawmaking is to be “by bill” and is subject to a majority vote of those elected to each house of the Legislature. Const 1963, art 4, §§ 22 and 26. Accordingly, the definition of “legislation” in Black’s Law Dictionary requires that we consider whether the compacts amount to “positive lawmaking.”
In Blank v Dep’t of Corrections, 462 Mich 103; 611 NW2d 530 (2000), this Court considered whether a provision in the Administrative Procedures Act, MCL 24.201 et seq., that required administrative agencies to obtain the approval of a joint committee of the Legislature or the Legislature itself before enacting new administrative rules violated the enactment and presentment requirements of Michigan’s Constitution, Const 1963, art 4, §§ 26 and 33.[13]
*377 In analyzing the question presented in Blank, we addressed whether the challenged action — a vote of the joint committee or the Legislature itself on an administrative rule — was “legislative” in nature, so that it was subject, under the enactment and presentment requirements of Michigan’s Constitution, to a majority vote of the full Legislature and gubernatorial approval.[14]
In resolving that question, we employed the analytical framework laid out by the United States Supreme Court in Immigration & Naturalization Service v Chadha, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983). As we noted in Blank, the United States Supreme Court in Chadha made four observations in determining that the action challenged in that case was inherently legislative and was subject to the enactment and presentment requirements of the United States Constitution:
First, the action “had the purpose and effect of altering ... legal rights, duties and relations of persons ... outside the legislative branch.” Second, the action supplanted legislative action. The only way the House could have obtained the same result would have been by enacting legislation. Third, the House’s action involved determinations of policy. Fourth, the constitution explicitly authorizes only four instances where one house of Congress can act alone. It does not include the authority for one house to exercise a legislative veto over duly authorized actions of the executive branch. [Blank, supra at 114, quoting Chadha, supra at 952-956 (citations omitted).]
*378 Applying Chadha’s framework in Blank, this Court held that the challenged action was “legislative” in nature and, therefore, it was subject to the enactment and presentment requirements of Michigan’s Constitution.
Because the Chadha/Blank framework provides necessary guidance in determining whether a challenged action constitutes “legislation” subject to the constitutional enactment requirements, I employ it in the context of this case.[15] Accordingly, in my judgment, we must consider: (1) whether the compacts at issue “ ‘had the purpose and effect of altering.. . legal rights, duties and relations of persons .. . outside the legislative branch,’ ” Blank, supra at 114; (2) whether the Governor’s action in negotiating the compacts and the Legislature’s resolution vote on the compacts supplanted legislative action; (3) whether the compacts involved determinations of policy; and (4) whether Michigan’s Constitution explicitly authorizes the Legislature to approve these compacts by a resolution vote even if they otherwise constitute “legislation.”
*379 i. legal rights, duties, and relations
The first factor, whether the compacts had the purpose and effect of altering legal rights, duties, and relations of persons outside the legislative branch, i.e., whether they have a general effect upon the citizens of Michigan, addresses essentially the same question as does the definition of “legislation” in Black’s Law Dictionary. That is, Black’s primarily defines “legislation” as the making of positive law, and when an action has the purpose and effect of altering legal rights, duties, and relations of persons outside the legislative branch, that action is typically an exercise in positive lawmaking.
What is important to understand is that, in the absence of the challenged tribal-state compacts, gambling on the subject Indian land was unlawful. Gambling in the absence of a compact was unlawful pursuant to 18 USC 1166, which, as noted above, provides that, in the absence of a tribal-state compact, state laws regulating or prohibiting gambling “shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State,” albeit, at least for criminal laws, through federal enforcement. 18 USC 1166(a). Casino gambling in Michigan is generally unlawful. MCL 750.301. The only casino gambling that is authorized in Michigan is that gambling conducted in accordance with the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 et seq. However, by its express terms, the MGCRA does not apply to “gambling on Native American land. ” MCL 432.203(2)(d),(5). Thus, casino gambling on Indian land cannot be authorized and conducted pursuant to the MGCRA, which leads to the inescapable conclusion that casino gambling on Indian lands located in Michigan is, pursuant to § 1166, subject to Michigan’s general prohi *380 bition against such gambling.[16] Accordingly, under § 1166, in the absence of a tribal-state compact, casino gambling on Indian land within Michigan’s borders is unlawful, and that general unlawfulness is to be enforced by the federal government.[17]
*381 Moreover, gambling on the subject Indian lands absent the challenged compacts was unlawful pursuant to 25 USC 2710(d)(1)(C). This is because, as noted, § 2710(d) provides that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State. . ..” Therefore, before these challenged compacts existed, gambling on the subject Indian lands was unlawful.
Thus, it becomes clear that, before the challenged compacts existed, the tribes would have been engaging in an unlawful activity had they endeavored to operate their respective casinos. It necessarily follows that the compacts had the intended purpose, and the effect, of altering legal rights and relations of Michigan citizens generally. The compacts purport to allow Indian tribes to lawfully engage in activities that would otherwise be unlawful.
Moreover, the compacts impose specific duties upon both the members of the tribes and upon non-Indian *382 peoples and entities. By way of example, the compacts impose a duty on the tribes to administer and enforce on the casinos the regulatory requirements embodied in the compacts. Further, the compacts impose a duty on local units of government to create a local revenue sharing board to receive and distribute a percentage of casino profits that the tribes are required under the compacts to disburse. Alternately, if the local units of government do not create a local revenue sharing board, it may be said that the compacts impose a duty on local units of government to expend their own government funds to cover the inevitable costs for public services, police, etc., that they will incur as a result of having a casino in their area. Under either scenario, the compacts impose duties on local units of government.[18] Accordingly, it is clear that the compacts had the intended purpose and the effect of altering the legal duties generally of Michigan citizens.
*383 Further, the tribal-state compacts alter legal relationships because the compacts remove from the federal government the jurisdiction to enforce the applicable state gambling laws and regulations that apply, pursuant to § 1166, on Indian land in the absence of a tribal-state compact and place that jurisdiction in the hands of the tribes themselves. This change in jurisdiction affects Michigan citizens generally because citizens engaging in gambling in tribal casinos were formerly subject to federal jurisdiction, but are now subject to tribal jurisdiction. Additionally, the compacts alter the legal relationships of Michigan citizens generally because they may allow anyone over the age of eighteen to gamble in tribal casinos, whereas the legal gambling age that applies to Michigan casinos subject to the MCGRA is twenty-one.
Thus, the first factor of the ChadhalBlank framework leads to the conclusion that the compacts constitute legislation. That is, the compacts “had the [intended] purpose and effect of altering . . . legal rights, duties and relations of persons .. . outside the legislative branch.” Blank, supra at 114.
II. SUPPLANTING LEGISLATIVE ACTION
The second ChadhalBlank factor requires that we consider whether the Governor’s action in negotiating the compacts and the Legislature’s resolution vote on *384 the compacts “supplanted legislative action.” In Blank, supra at 114, we further elaborated on this point, as did the United States Supreme Court in Chadha, by considering whether “[t]he only way the House could have [properly] obtained the same result would have been by enacting legislation.” Thus, we must consider how, in the absence of the challenged compacts, the Legislature could alternatively have achieved the same result, i.e., how the Legislature could alternatively have made gambling on Indian land lawful. If no IGRA tribal-state compact exists, general state laws pertaining to the regulation or prohibition of gambling apply on any particular Indian land as they apply elsewhere in the state. 18 USC 1166. Therefore, in the absence of a compact, if the Legislature wanted to make gambling on Indian land lawful, the only way it could do that would be by either changing the gambling laws that are generally applicable within the state or by changing the reach of the MGCRA. Changing those laws would, it cannot seriously be disputed, require “legislation.” Thus, it becomes clear that the compacts effectively supplanted legislative action and, therefore, they themselves constitute “legislation.”[19]
III. DETERMINATIONS OF POLICY
The third Chadha/Blank factor requires that we consider whether the compacts “involved determina *385 tions of policy.” Blank, supra at 114. The compact negotiation process required the Governor to undertake and resolve multiple policy-making decisions of great consequence to this state, the most significant of which was the initial decision to make lawful what was otherwise unlawful — casino gambling on the subject Indian lands. The fact that casino gambling engenders considerable controversy and passion throughout our society at large, as evidenced by the very existence of this lawsuit, underscores the significance of the policy decision that these compacts represent.
Moreover, the compacts represent a host of additional policy decisions that sprang from the initial decision to make gambling lawful on the subject Indian lands. These include, but certainly are not limited to, decisions regarding the number of compacts to sign and the number of casinos to allow, the minimum gambling age that would be enforced in the relevant casinos, the percentage of profits that the tribes would be required to submit to the state and the subsequent use of those funds by the state, the decision to incorporate into the compacts the protections of the Michigan Employment Security Act, MCL 421.1 et seq., and the Worker’s Disability Compensation Act, MCL 418.101 et seq., and the decision to leave enforcement of the compact rules and regulations to the tribes themselves rather than delegating that duty to the relevant state agencies as the state clearly could have done pursuant to 25 USC 2710(d)(3)(C).[20]
*386 In my judgment, these policy decisions are exactly the sorts of decisions that properly belong within the province of the Legislature.[21] This point was well made by the highest court for the state of New York, the Court of Appeals of New York, in a decision in which that Court held that IGRA tribal-state compacts represent legislation. In Saratoga Co Chamber of Commerce *387 v Pataki, 100 NY2d 801, 822-823; 798 NE2d 1047; 766 NYS2d 654 (2003), the court stated:
IGRA itself contemplates that states will confront several policy choices when negotiating gaming compacts. Congress provided that potential conflicts may be resolved in the compact itself, explicitly noting the many policies affected by tribal gaming compacts. Indeed, gaming compacts are laden with policy choices, as Congress well recognized.
“Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—
“(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
“(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
“(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
“(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
“(v) remedies for breach of contract;
“(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
“(vii) any other subjects that are directly related to the operation of gaming activities.” [25 USC 2710(d)(3)(C).]
Compacts addressing these issues necessarily make fundamental policy choices that epitomize “legislative power. ” Decisions involving licensing, taxation and criminal and civil jurisdiction require a balancing of differing interests, a task the multi-member, representative Legislature is entrusted to perform under our constitutional structure. [Emphasis added.]
*388 I agree with the court’s decision on this issue in Saratoga Co and with the other state supreme courts that have considered this issue and reached a similar conclusion. See State ex rel Clark v Johnson, 120 NM 562; 904 P2d 11 (1995); State ex rel Stephan v Finney, 251 Kan 559; 836 P2d 1169 (1992); Panzer v Doyle, 271 Wis 2d 295; 680 NW2d 666 (2004); Narragansett Indian Tribe of Rhode Island v Rhode Island, 667 A2d 280 (RI, 1995).[22] It is evident that the compacts “involved determinations of policy,” Blank, supra at 114, such that they themselves constitute “legislation.”
XV. MICHIGAN CONSTITUTION
The fourth Chadha/Blank factor requires that we consider whether Michigan’s Constitution explicitly authorizes the Legislature to approve these compacts by resolution even if the compacts otherwise constitute legislation.
Before 1908, the Michigan Constitution allowed the Legislature to make laws by the resolution process. See Const 1850, art 4, § 19. However, the constitutions of *389 1908 and 1963 leave out that earlier proviso, and our Constitution now makes it entirely clear, as already explained, that lawmaking is subject to the enactment requirement. See Const 1963, art 4, §§ 1, 22, and 26.
In Becker v Detroit Savings Bank, 269 Mich 432, 434-436; 257 NW 855 (1934), this Court considered whether a legislative resolution can create binding law. In accordance with our Constitution, the Becker Court held that it could not, stating:
The language of the constitution is in itself a complete answer to the proposition. It provides in express terms that there shall be but one mode of enacting a “law” thereunder, and that mode is the exclusive measure of the power of the legislature in that regard. A mere resolution, therefore, is not a competent method of expressing the legislative will, where that expression is to have the force of law, and bind others than the members of the house or houses adopting it.... The requirements of the Constitution are not met by that method of legislation. “Nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential.” Cooley [Const Lim at 155, ch 6]....
[W]hile the resolution of the Legislature is entitled to respectful consideration, it is not law and courts are bound by the law. [Id. at 434-436 (emphasis added).]
Moreover, Michigan’s Constitution provides a number of specific instances in which the Legislature is explicitly authorized to act by way of resolution. See Const 1963, art 4, §§ 12, 13, 37; art 5, § 2; art 6, § 25. However, none of these provisions is applicable to this issue and none provides a basis for concluding that our *390 Constitution explicitly grants the Legislature the authority to approve the instant compacts by way of resolution even though they otherwise constitute legislation.[23] Therefore, the Legislature’s approval of the challenged compacts is not constitutionally exempted from the general lawmaking procedures embodied in our Constitution. Thus, the fourth Chadha/Blcmk factor likewise leads to a finding that the Legislature was required to adopt the compacts consistently with the enactment requirements of Michigan’s Constitution.
Accordingly, in my judgment, the tribal-state compacts at issue constitute legislation. The compacts had the purpose and effect of generally altering legal rights, duties, and relations of Michigan citizens; they supplanted legislative action; they represent determinations of policy issues of fundamental importance to the social and economic environment of the state of Michigan; and our Constitution does not authorize the Legislature to approve the compacts by a resolution vote.
B. IS A RESOLUTION NONETHELESS CONSTITUTIONAL?
Having determined that the Chadha/Blank analytical framework leads to the conclusion that the compacts constitute “legislation” subject to the enactment requirement of Michigan’s Constitution, I will now con *391 sider the significant issues raised by defendants and upon which the majority opinions are primarily based.
i. FEDERAL preemption
First, Justice KELLY concludes that the compacts are not “legislation” because federal law preempts Indian gambling regulation unless the state prohibits gambling. Thus, because Michigan permits limited casino gambling, Justice KELLY reasons that Michigan may not legislate with respect to gambling on Indian land. Ante at 339-342. In support of this proposition, the opinion refers to 25 USC 2701 of IGRA, which provides:
The Congress finds that
(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.
Justice KELLY has misconstrued the relevance of § 2701(5). This provision is simply a part of the Congress’s legislative “findings” and does not constitute substantive law.[24] That is, the Congress found, before enacting IGRA, that Indian tribes had the “exclusive right to regulate gaming activity on Indian lands if the *392 gaining activity [was] not specifically prohibited by Federal law and [was] conducted within a State which did not. . . prohibit such gaining activity.”[25] Id. Having so found, the Congress subsequently enacted IGRA, in order to “provide a statutory basis for the regulation of gaming .. . .” 25 USC 2702(2). Because 25 USC 2701(5) is not substantive law, Justice KELLY errs in invoking it as such and using it to effectively shield Indian tribes from state regulation of gambling otherwise consistent with the text of IGRA.
II. STATE AUTHORITY TO LEGISLATE
Second, defendants argue that the compacts cannot constitute legislation because the state has no authority to legislate casino gambling on Indian lands, and, therefore, the compacts merely constitute an “agreement” between the tribe and the state that has nothing to do with “legislation.” However, pursuant to the express terms of IGRA itself, the Congress recognized that a tribal-state compact may result in state legislation. Therefore, it cannot be disputed that IGRA permits states to legislate pursuant to a compact. Section 2710(d)(5) of IGRA provides:
Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such *393 regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any tribal-state compact entered into by the Indian tribe under paragraph (3) that is in effect.
This section both affirms that an Indian tribe’s right to regulate gambling on its lands is not exclusive and that the state does, indeed, have authority to regulate gambling on Indian lands through lawmaking. The compact provisions in IGRA merely ensure that any state regulation over tribal gambling arises out of the negotiation process; they do not, however, prohibit such regulation.
The majority concludes, however, that the fact that the compacts must arise out of the negotiation process means that they do not constitute “legislation” because legislation must be “unilateral.” Opinion of Corrigan, C.J., ante at 318; opinion of Kelly, J., ante at 344. That is, if a tribal-state compact, and thus any state regulation over tribal gambling, can only result through a federally mandated negotiation process, it cannot be said that the state enjoys a right to “unilaterally” legislate gambling on Indian land. In support of this theory — that unless a state may “unilaterally” regulate, it may not “legislate” — Justice KELLY refers to this Court’s opinion in Westervelt v Natural Resources Comm, 402 Mich 412, 440; 263 NW2d 564 (1978). Ante at 344.
Westervelt considered whether an executive agency “legislates” when it engages in rulemaking pursuant to a legislative delegation of power. If so, the executive agency would be violating the separation of powers doctrine embodied in Const 1963, art 3, § 2 because, pursuant to Const 1963, art 4, § 1, “[t]he legislative power of the State of Michigan is vested in [the Legis *394 lature].”[26] Westervelt, in concluding that an executive agency does not legislate when it engages in rulemaking, stated, “the concept of ‘legislation,’ in its essential sense, is the power to speak on any subject without any specified limitations.” Westervelt, supra at 440. (Emphasis deleted). The “specified limitations” referred to in Westervelt were those limitations inherent in the legislative delegation of authority to the executive branch. Because an executive agency is confined in its exercise of authority to the relevant legislative delegation, including any specific limitations upon such delegation set by the Legislature, the power to engage in rulemaking is not a power to “legislate.” It could not be such a power under the Constitution if the delegation is valid because the Constitution does not allow any entity to exercise “legislative power” other than the Legislature.[27]
Justice KELLY argues that the power to speak “without any specified limitations” means the power to “unilaterally” legislate. In this case, she argues, the Legislature may not speak “without specified limitations” because it is limited by the mandate that the state must negotiate in good faith with the tribes and, therefore, it may not legislate. Ante at 344. In my judgment, Westervelt must be interpreted within the different context of that case. I see no reason to expand *395 its specific holding to mean that any time the Legislature is constricted in any sense by “any specified limitation,” it may not “legislate.” A legislature is always subject to “specified limitations,” such as those posed by the federal and state constitutions, or, in this case, by federal law. Indeed, the very premise of our constitutional system is that all governmental institutions operate under “specified limitations.” The fact that federal law imposes some limits on the state’s power to regulate in a specific area simply cannot mean that any legislative action touching upon such an area is not actually “legislation.”
Chief Justice CORRIGAN, in support of her contention that the state has no power to “unilaterally” regulate, and therefore legislate, tribal gambling under § 2710(d), cites Boerth v Detroit City Gas Co, 152 Mich 654; 116 NW 628 (1908), and Detroit v Michigan Pub Utilities Comm (MPUC), 288 Mich 267; 286 NW 368 (1939), for the proposition that the power to legislate does not require “consent” from those subject to its powers. Ante at 318. Because § 2710(d) provides for a process of negotiation, the Chief Justice opines that it gives tribes a power to “consent” that negates a finding that a compact constitutes legislation. In Boerth and MPUC, this Court held that, absent a legislative delegation of power to Detroit, Detroit possessed no legislative power to set gas rates because such power was within the exclusive jurisdiction of the Legislature. However, Detroit was found to possess a power to contract for reasonable gas rates under its power to control its streets. In this case, the state possesses regulatory power over tribal casino gambling even in the absence of a compact, see § 1166, including the outright power to prohibit such gambling. Moreover, the “consent” that the Chief Justice argues that the tribes may exercise in *396 this case, by virtue of § 2710(d), is the type of “consent” referred to in Boerth and MPUC. Although § 2710(d) provides for a negotiation process, the tribes are not wholly free to withhold their “consent” from the Legislature to enter into contracts regulating casino gambling on their lands and to, instead, engage in such gambling without compacts. This is because in the absence of a compact, casino gambling is unlawful. § 2710(d)(1).[28]
in. CONTRACTUAL NATURE OF COMPACTS
Third, the majority concludes that the tribal-state compacts are not legislation because they merely constitute contracts between two sovereign entities that the Governor, pursuant to IGRA, may enter into on behalf of the state and that the Legislature may approve of by resolution vote.[29] Opinion of CORRIGAN, C.J., ante at *397 318-319; opinion of Kelly, J., ante at 346-347. I do not dispute that the compacts are akin to contracts of a unique nature. However, as explained above, these “contracts” create new law and constitute legislation and they purport to bind the state of Michigan to that legislation. That is the pivotal consideration in this case. A “contract” may, in effect, create new law and such a legislative contract should not be exempt from the constitutional provisions otherwise applicable to legislation.[30] Neither the executive nor the legislative branch of our state government may circumvent the constitutionally mandated processes for enacting legislation by entering into a contractual relationship. However, I will consider whether there is some source of law that does allow the Governor to enter into a compact without legislative approval consistently with the enactment requirement of Michigan’s Constitution.
First, it should be considered whether IGRA itself, regardless of state constitutional procedures, provides that a Governor may enter into a tribal-state compact with only a resolution vote of the Legislature. It is clear that IGRA does not so provide. The court in Saratoga Co, supra at 822, stated:
*398 IGRA imposes on “the State” an obligation to negotiate in good faith (25 USC 2710[d][3][a]), but identifies no particular state actor who shall negotiate the compacts; that question is left up to state law .... As the Supreme Court noted, the duty to negotiate imposed by IGRA “is not of the sort likely to be performed by an individual state executive officer or even a group of officers.” [Quoting Seminole Tribe of Florida v Florida, 517 US 44, 75 n 17; 116 S Ct 1114; 134 L Ed 2d 252 (1996), citing State ex rel Stephen Finney, supra.]
Likewise, in Clark, supra at 577, the Supreme Court of New Mexico stated:
We entertain no doubts that Congress could, if it so desired, enact legislation legalizing all forms of gambling on all Indian lands in whatever state they may occur.... That is, however, not the course that Congress chose. Rather, Congress sought to give the states a role in the process .... It did so by permitting Class III gaming only on those Indian lands where a negotiated compact is in effect between the state and the tribe. [25 USC 2710(d)(1)(C).] To this end, the language of the IGRA provides that “Any State ... may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian Tribe.” Id. § 2710(d)(3)(B). The only reasonable interpretation of this language is that it authorizes state officials, acting pursuant to their authority held under state law, to enter into gaming compacts on behalf of the state. [Emphasis added.]
Accordingly, IGRA does not provide or require that the Governor shall have the power to bind the state to tribal-state compacts with only a resolution vote of the Legislature. The pertinent consideration is which state actor has the power to bind the state to a legislative compact and according to which procedures under state law.[31]
*399 Second, it is therefore necessary to consider whether state law grants the Governor the authority to bind the state to a tribal-state compact with only a resolution vote of the Legislature regardless whether that compact constitutes legislation. The Michigan Constitution provides that “[t]he executive power is vested in the governor.” Const 1963, art 5, § 1. The majority essentially argues that the executive power includes the power to bind the states to contractual agreements with sovereign entities and, therefore, whether those agreements otherwise constitute “legislation” is irrelevant. The “executive power” is, first and foremost, the power to enforce. This observation was concisely summed up by this Court in People ex rel Attorney General v Holschuh, 235 Mich 272, 274-275; 209 NW 158 (1926), in which we stated, “Consideration of some fundamen *400 tal principles relative to the powers of government will aid greatly in determining the issues before us. .. . The law.. . must observe constitutional limitations; but within such limitations the legislative power may command, the executive power must enforce, and the judicial power respond.” (Emphasis added.)[32] While our state Constitution grants specific additional powers to our executive branch of government beyond the “enforcement” of legislative enactments, I find no provision in our Constitution that supports a finding that the Governor possesses broad powers to bind the state to legislative compacts with foreign sovereignties absent legislative action consistent with the enactment requirement. Nor have my colleagues pointed to any language of that sort.
In addressing this issue, it is also necessary to consider what our Constitution does say regarding the Governor’s right to bind the state to an “intergovernmental agreement.” Const 1963, art 3, § 5 provides:
Subject to provisions of general law, this state or any political subdivision thereof, any governmental authority or any combination thereof may enter into agreements for the performance, financing or execution of their respective functions, with any one or more of the other states, the *401 United States, the Dominion of Canada, or any political subdivision thereof unless otherwise provided in this constitution.
Thus, pursuant to this constitutional provision, the Governor of this state may enter into intergovernmental agreements without the advice or consent of the Legislature — whether by resolution vote or consistently with the enactment requirements of our Constitution. However, this power is not unlimited. First, it is specifically limited to agreements with “the other states, the United States, the Dominion of Canada, or any political subdivision thereof.” The power to enter into an intergovernmental agreement with an Indian tribe is conspicuously absent. Second, the power is specifically limited to those agreements necessary “for the performance, financing or execution of [its] functions.” Neither IGRA nor any other law places the duty or the power to determine the scope and parameters of gambling within Michigan’s borders, on or off Indian lands, within the “functions” of the executive branch. Accordingly, unless the Legislature properly delegates to the executive branch a rulemaking power to set the parameters for gambling on Indian lands within Michigan’s borders, that power is not, in my judgment, reasonably within the scope of the executive branch’s “functions.”
It may be said that because the intergovernmental agreement provision of the Michigan Constitution does not refer to agreements with Indian tribes that provision is inapplicable to this case. However, in light of the fact that the powers of the executive branch are constitutionally defined, I read additionally a negative implication in Const 1963, art 3, § 5. Because our Constitution contains an express provision regarding intergovernmental agreements that may validly be entered into by governmental authorities, I conclude that, *402 subject to provisions of general law, intergovernmental agreements beyond the scope of Const 1963, art 3, § 5 are invalid.[33]
Moreover, even were I to decline to read a negative implication into Const 1963, art 3, § 5, this provision is, nonetheless, significant insofar as it expressly provides that, in the realm of applicable intergovernmental agreements, no branch of the government may contract in such a way that is inconsistent with its own powers or that usurps the powers of another branch. That rule, which is consistent with the separation of powers doctrine of Const 1963, art 3, § 2, should apply equally to intergovernmental agreements that are expressly subject to Const 1963, art 3, § 5, as well as those that are not. Thus, in any case, a governmental authority may only bind the state to an intergovernmental agreement that is “for the performance, financing or execution of their respective functions . . ..” Id. As already noted, absent a proper legislative delegation of power to the executive branch, the duty and power to set the parameters for casino gambling on land within Michigan’s borders is not in any comprehensible sense a “function” of the executive branch.
The United States Constitution expressly provides that the President “shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, *403 provided two thirds of the Senators present concur ...." US Const, art II, § 2, cl 2.[34] The Michigan Constitution notably contains no explicit authorization for the Governor to enter into treaties with sovereign nations without the majority approval of the entire Legislature. I have found no case law, nor have my colleagues identified such a law, that would support a determination that, despite our Constitution’s silence on the issue, such a right exists.[35]
*404 I believe that no source of law, federal or state, exists that would permit the Governor to bind the state to these legislative compacts without the approval of the Legislature consistent with the enactment requirements of Michigan’s Constitution. Because the compacts constitute legislation, they were subject to Const 1963, art 4, §§ 22 and 26. Therefore, I would reverse the judgment of the Court of Appeals on this issue and hold that the approval of HCR 115 by resolution, rather than by bill, did not comport with the enactment requirement of our Constitution.[36]
C. DO AMENDATORY PROVISIONS VIOLATE THE CONSTITUTION?
Each of the challenged tribal-state compacts contains a provision that purports to empower the Governor to amend it on behalf of the state without seeking legislative approval of any specific amendment.[37] This provision, plaintiffs contend, violates the separation of powers doctrine embodied in art 3, § 2 of Michigan’s Constitution because it grants broad authority to the Governor to usurp a legislative power. That is, plaintiffs argue that, like the original compacts, any amendment constitutes “legislation” that is subject anew to the enactment requirement of Const 1963, art 4, § 26. *405 Plaintiffs essentially argue that even had the Legislature properly adopted the compacts, the specific amendatory provision would nonetheless violate the separation of powers doctrine because the Legislature may not, even by properly enacted legislation, grant the Governor a general power to amend that legislation. Defendants contend, on the other hand, that the amendments to the compacts, like the compacts themselves, in no way implicate “legislation,” and, therefore, the Governor does not usurp legislative functions in exercising the Governor’s power to amend them.
The Court of Appeals ruled that this issue was not ripe for review because the Governor had not yet attempted to amend the compacts. However, during the pendency of this suit, Governor Granholm purported to amend the compact with the Odawa Tribe by (1) extending the terms of the compact from twenty to twenty-five years, (2) requiring the eight percent semiannual payment that the tribes must make to the Michigan Strategic Fund to instead be made “to the State ... as the governor so directs,” (3) increasing the semiannual payment from eight percent of profits to either eight, ten, or twelve percent depending on the profits of the casino, and (4) providing less restrictive limitations on gaming by requiring the tribe to make the semiannual payments to the state only as long as the state does not authorize new gaming in ten specified counties rather than statewide as under the original compact terms. Accordingly, this issue is at present ripe for review.[38]
*406 As long ago as 1874, this Court recognized the importance of respecting the proper lines of demarcation between the practices of our three branches of government. In The People ex rel Sutherland v Governor, 29 Mich 320, 324-325 (1874), Justice COOLEY stated:
And that there is such a broad general principle seems to us very plain. Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. .. . This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. [Emphasis added.]
This “broad general principle” elaborated upon by Justice COOLEY in Sutherland is what is now embodied in the separation of powers doctrine of Michigan’s Constitution. Art 3, § 2 of our Constitution provides, “The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.”
“The legislative power of the State of Michigan is vested in a senate and a house of representatives.” Const 1963, art 4, § 1. Thus, the Governor may not exercise legislative power unless expressly provided for in the Constitution. Yet, the amendatory provision of the tribal-state compacts purports to grant the Governor a broad and undefined legislative power — the power *407 to amend legislation. The Legislature may not, either by resolution or by bill, delegate to the executive branch a broad and undefined power to amend legislation. Thus, I would reverse the judgment of the Court of Appeals on this issue and hold that the amendatory provision contained in each compact violates the separation of powers doctrine and is, thus, void insofar as it may be regarded as granting sole amendatory power over legislation to the Governor.[39]
D. DO COMPACTS CONSTITUTE LOCAL ACTS?
For the reasons set forth in part VI of Chief Justice CORRIGAN’s lead opinion, I do not believe that the compacts violate Const 1963, art 4, § 29. Accordingly, on this issue, I concur in the lead opinion that the decisions of the lower courts should be affirmed.
rv CONCLUSION & CONSEQUENCES
We have been asked to consider, in an action seeking declaratory relief, whether the four tribal-state compacts at issue are inconsistent with various procedures *408 and doctrines embodied in Michigan’s Constitution. Having considered the questions presented, I strongly dissent from the majority judgment that these compacts have been effected consistently with our Constitution. I would hold that these compacts constitute legislation and, thus, were subject to legislative approval consistent with the lawmaking procedures of art 4, §§ 22 and 26 of our Constitution. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court on this issue.
Further, in my judgment, the provision in the compacts that purports to empower the Governor with sole amendatory power over their covenants violates the separation of powers doctrine of art 3, § 2 of our Constitution. I therefore would hold that this provision is void insofar as it grants sole amendatory power over legislation to the Governor. Absent a proper delegation of power to the executive branch, amendments of the compacts must themselves comport with the bill-making enactment procedures of our Constitution. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court on this issue as well.
Finally, I believe that the compacts do not violate the local acts provision of art 4, § 29 of our Constitution. Accordingly, on this issue, I concur with the analysis as set forth in part VI of the lead opinion, and would affirm the decisions of the lower courts.
Concerning the consequences of this opinion for the casinos operated by the tribes, I would afford plaintiffs no more relief than that requested. That is, in this action for declaratory judgment, I have sought only to say what the Constitution requires of the compact process. In order to assess the consequences of this requirement for the compacts at issue, other consider *409 ations must necessarily come into play, including the standards to be applied by the Secretary of the Interior, pursuant to 25 USC 2710(d)(8), in approving a compact, in particular, a compact approved through procedures apparently acquiesced in by the executive and legislative branches of a state;[40] the standards by which the Secretary of the Interior will revisit prior approval of a compact;[41] and various equitable considerations pertinent to casinos that have already been built and are presently operating.
The analyses of the majority are deeply flawed and circular. As is typical in cases of this sort, the long-term consequences of the majority judgment cannot be fully predicted, but what is predictable is that there will be consequences in terms of the relationships between the branches of government. The result of the majority’s analyses in this case is that a matter of fundamental policy concern to the people of this state — casino gambling and its social and economic impact — a realm in which the federal government has unequivocally authorized Michigan to exercise regulatory authority, has now been transformed into the exclusive province of a single public official, the Governor.[42] By concluding that *410 tribal-state casino gambling compacts do not constitute legislation, and are not required to conform to the legislative process set forth in the Michigan Constitution, the majority has effectively ensured that in future cases the Legislature’s role in approving such compacts will exist merely at the sufferance of the Governor. That is, according to the understanding of the majority, unless the Governor agrees in future compacts to affirmatively grant a role for the Legislature, it will have no role. Rather than both the executive and legislative branches being required to approve the expansion of casinos within Michigan, the approval of a single branch, the executive branch, will be sufficient.
The lead decision represents the first state supreme court decision in the United States to conclude that a tribal-state casino gambling compact does not constitute “legislation” and, therefore, does not require the approval of the branch of government that is most directly representative of the people.

 If the state prohibited class III gaining within its borders, Cabazon held that California could enforce its criminal laws relating to that prohibition on Indian lands through 18 USC 1162.

 Additionally, the Court in Cabazon held that “[under]... exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members” even absent express Congressional consent. Cabazon, supra at 215. However, the Court resolved that tribal gambling was not an area encompassing such “exceptional circumstances” so as to “escape the preemptive force of federal and tribal interests ....” Id. at 221.

 See also United States v Santa Ynez Band of Chumash Mission Indians, 983 F Supp 1317, 1323 (CD Cal, 1997) (“In [Cabazon], the Supreme Court sharply limited the power of states to apply their gambling laws to Indian gaming. An essential element of its decision was that Congress had not acted specifically to make state gambling laws applicable in Indian country. This decision made clear that it would require a new act of Congress for states to have any effective ability to prevent or regulate Indian gaming. IGRA was enacted in direct response to Cabazon... . Subsection (a) of § 1166 expressly makes state gambling laws applicable in Indian country.”) See also Confederated Tribes of Siletz Indians of Oregon v United States, 110F3d 688, 692 (CA 9, 1997); Pueblo of Santa Ana v Kelly, 104 F3d 1546, 1548 n 3 (CA 10, 1997); Cheyenne River Sioux Tribe v South Dakota, 830 F Supp 523, 525-526 (D SD, 1993), aff'd 3 F3d 273 (CA 8, 1993).

 It appears that states have some enforcement powers under § 1166(a) —civil enforcement powers. See Santa Ynez Band, supra at 1322:
Consideration of the structure of § 1166 suggests strongly that Congress intended to distinguish civil enforcement to prevent future acts of non-conforming gaming from criminal enforcement efforts to punish past acts. As to the latter, § 1166(b) and (d) leave no doubt that criminal enforcement is the exclusive province of the United States. The United States contends that Congress also intended for it to have the same exclusive power to bring civil enforcement actions under § 1166(a). The statute says nothing at all to suggest this. On the contrary, the more natural inference to be drawn from Congress’ decision to make state law applicable, as such, in § 1166(a), rather than to convert it to federal law as in § 1166(b), is that Congress intended to divide the enforcement of the two subsections between the states and the United States.
If Congress had not intended § 1166(a) to be used by the states for civil enforcement of the state laws made applicable by it, there was no need first to make all state gambling laws applicable, as such, and then to carve out only those acts which would be punishable under state law and redefine them as identical, independent federal offenses [under § 1166(b)].

 In 1996, the United States Supreme Court somewhat limited the reach of igra in Seminole Tribe of Florida v Florida, 517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996). In Seminole Tribe, the Court considered 25 USC 2710(d)(7) of igra, a provision that permits Indian tribes to sue a state in federal court when that state has refused to negotiate in good faith for a tribal-state compact. The Court ruled that this provision violates state sovereign immunity as preserved by the Eleventh Amendment of the United States Constitution and is therefore unconstitutional.

 For example, if state law provides that casino gambling anywhere in the state is prohibited and punishment for illegal casino gambling is imprisonment of five years and a fine of $10,000, that is the law that applies to tribal lands under § 1166 in the absence of a compact. If the state decides at some later point, perhaps because of a large illegal gambling problem specifically on tribal lands, to amend its laws to hold that gambling is still entirely prohibited, but that the punishment is now imprisonment of twenty-five years and a $200,000 fine, that amended law becomes the law that is applicable to tribal lands under § 1166 in the absence of a compact. Thus, by making state gambling laws — whatever those laws are at a given time — applicable to Indian land in the absence of a compact, IGRA gives states meaningful regulatory authority over *369 casino gambling on Indian land. Therefore, Chief Justice Corrigan is incorrect when she states that “states have no authority to regulate tribal gaming under the igra unless the tribe explicitly consents to the regulation in a compact.” Ante at 319.

 See also Sycuan Band of Mission Indians v Roache, 788 F Supp 1498, 1506 (SD Cal, 1992), aff'd 54 F3d 535 (CA 9, 1994) (“The balance struck by Congress under the IGRA appears to be that the state laws governing gaining apply, for the most part, with the same force and effect the laws would have elsewhere in the state. Thus, by federalizing state law, the states could generally define the boundary between legal and illegal gaming, and could be assured that activities that would be illegal if performed outside the reservation boundaries would also be illegal within the reservation boundaries.”).

 Cabazon, supra at 221.

 These tribes were the Sault Ste. Marie Tribe of Chippewa Indians, the Grand Traverse Band of Ottawa and Chippewa Indians, the Keweenaw Bay Indian Community, the Hannahville Indian Community, the Bay Mills Indian Community, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and the Saginaw Chippewa Indian Tribe. All these tribes are currently operating casinos.

 After IGRA was passed, the tribes that were already engaged in casino gambling in Michigan requested that the Governor negotiate gaming compacts. The negotiations stalled and the tribes filed suit in federal court to compel negotiations. See Sault Ste Marie Tribe v Engler, 93 F Supp 2d *371 850 (WD Mich, 2000). During this litigation, the parties reached a settlement and the court entered a consent judgment. Essentially, the consent judgment is constituted of the seven 1993 compacts entered into by Governor Engler and the tribes in accord with the settlement. This consent judgment should not be interpreted as a federal court determination that a resolution vote is a proper adoption because the court did not address this question; it merely incorporated into the consent judgment the terms of the settlement as agreed to by Governor Engler and the tribes. Moreover, the United States Court of Appeals for the Sixth Circuit, in Keweenaw Bay Indian Community v United States, 136 F3d 469, 477 (CA 6, 1998), in which the court addressed an issue pertaining to one of the 1993 consent judgment compacts (but not the issue implicated in this case), stated:
Regarding obtaining the Michigan Governor’s “approval” twice, we point out that a governor’s endorsement of a compact as required by the terms of a compact is coincidental, varied and dependent on the relevant state laws. See, e.g., [Pueblo of Santa Ana v Kelly, 104 F3d 1559 (CA 10, 1997)], cert den 522 US 807 [118 S Ct 45; 139 L Ed 2d 11] (1997) (deciding that Governor of New Mexico lacked authority, under New Mexico Constitution or state statute, to bind state to tribal-state compacts).
Thus, the Sixth Circuit expressly recognized that a governor might not have the power to bind the state to an igea compact and that the question is a matter of state law.

 These tribes are the Little Traverse Bay Band of Odawa Indians, the Pokagon Band of Ottawa Indians, the Little River Band of Ottawa *372 Indians, and the Nottawaseppi Huron Potawatomi. Of these tribes, the Little Traverse Bay Band and the Little River Band are currently operating casinos.

 See § 11 of the compacts.

 The differences between the two concurring opinions in Blank and the majority opinion are not pertinent to the analysis of Blank as set forth in this opinion.

 In this case, the presentment requirement embodied in Michigan’s Constitution, Const 1963, art 4, § 33, requiring that laws enacted by the Legislature be approved by the Governor before taking effect, is not at issue because the Governor signed the compacts. Thus, the issue, as noted, is whether the compacts violate the enactment requirements of Const 1963, art 4, § 26 because they constitute legislation.

 Chief Justice CORRIGAN determines that the Chadha/Blank framework is not applicable to this case, despite the fact that the issue in this case is whether a certain deliberate act undertaken by a branch of our government violates the Constitution because the substance of the act constitutes “legislation,” and this is specifically the issue that was addressed in Chadha and Blank. She contends that the Chadha/Blank framework is inapplicable because this case concerns IGRA compacts and not a legislative veto power and “our Constitution is silent regarding the proper form of legislative approval of tribal-state gaming compacts under IGRA . ...” Ante at 330. However, the point of invoking Chadha/Blank is only to determine whether the compacts amount to legislation. If they do, Const 1963, art 4, § 22 and § 26 require that they he subject to bill-making approval. She tautologically surmises that the Chadha/Blank framework is not relevant because the compacts do not constitute legislation, but the very point of utilizing the Chadha/Blank framework is to determine whether the compacts constitute legislation. If so, then our Constitution is not silent on this issue.

 Moreover, I find to be of significance the fact that MCL 432.203 not only expressly provides that the mgcra is inapplicable to casino gambling on Indian lands, but it also provides:
If a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land or land held in trust by the United States for a federally recognized Indian tribe, the legislature shall enact legislation creating a new act consistent with this act to regulate casinos that are operated on Native American land or land held in trust by the United States for a federally recognized Indian tribe. The legislation shall be passed by a simple majority of members elected to and serving in each house. [MCL 432.203(5).]
Thus, within the framework of the mgcra, the Legislature apparently recognized that if Michigan is granted the right to regulate gambling on Indian lands within Michigan’s borders, such ensuing regulation would be “legislative” in nature and would require legislative action in accordance with the enactment requirement of Const 1963, art 4, § 26. In fact, the MGCRA requires that the Legislature pass legislation regulating gambling on Indian lands if federal law so permits. It is clear, in my judgment, that igra grants states, through both § 1166 and the compacting process of § 2710(d), a means of regulating gambling on Indian lands. Accordingly, pursuant not only to Const 1963, art 4, §§ 22 and 26, but also pursuant to the Legislature’s own self-imposed mandate in MCL 432.203(5), the compacts, because they represent federally permitted state regulation of gambling on Indian lands, should have been passed by a majority of those elected to and serving in each house.

 My colleagues in the majority, in my judgment, simply ignore the relevance of § 1166 in determining the lawfulness, in the absence of a compact, of casino gambling on Indian land. They do this by summarily noting and relying on the fact that it is the federal government that is charged under § 1166 with enforcing the applicable state law regulations. Opinion of Corrigan, C.J., ante at 321-323; opinion of Kelly, J., ante at 342-343. As already indicated, I agree with the United States Court of Appeals for the Ninth Circuit in Artichoke Joe’s, supra at 722, that, “the fact that the federal government retained [the enforcement] power does *381 not change the fact that [states] may enact laws and regulations concerning gambling that have an effect [in the absence of a compact] on Indian lands.” That is, the states retain substantive authority over gambling law on Indian lands. See n 6. Chief Justice Corrigan further states that § 1166 does not truly give the states regulatory power because “the federal government may conclude at any time that it will no longer apply state law and so amend igra.” Ante at 323. While it is true that it is within Congress’s power to amend the IGRA, this fact is irrelevant because we are called upon to decide this case under the law as it is today, and not under the law as it could conceivably one day be. Moreover, Chief Justice Corrigan opines that Congress chose to make state casino gambling laws applicable to Indian land “for expediency.” Id. She provides no support for this finding. The relevant legislative history indicates that Congress chose to make state gambling laws applicable to tribes not for reasons of “expediency,” but to-specifically give states some regulatory power over casino gambling on Indian land. See Cheyenne River Sioux Tribe, supra at 526.

 Defendants argue, and the majority concludes, that the compacts do not actually require the creation of local revenue sharing boards, hut rather permit local units of government to voluntarily create such boards if they wish to enjoy the benefits of the annual percentage payment that the tribes are to make to those local units of government pursuant to the compacts. Opinion of Corrigan, C.J., ante at 325; opinion of Kelly, J., ante at 345-346. This argument is both flawed and disingenuous. First, as is expressly stated in the compacts themselves, the annual payment of funds by the tribe to the local revenue sharing boards is meant tfo “provide financial resources to those political subdivisions of the State which actually experience increased operating costs associated with the operation of the Class III gaming facility[ies].” See § 18(A)(ii) of the compacts. Thus, it is evident that the “choice” the local units of government have is either: (1) to create a local revenue sharing board or (2) to simply assume the actual costs incurred by the unit of government in the operation of the casinos. Either choice, as noted above, imposes a duty on local units of government. Moreover, I note that the compacts purport to mandate the creation of the local revenue sharing boards, as evidenced by the term “shall.” That is, the compacts provide that “a Local Revenue Sharing Board shall be created by those local units of government ....” Thus, the compacts themselves do not purport to provide any “choice” on this matter.
*383 My colleagues espouse a third-party beneficiary analysis in reaching their conclusion that the compacts impose no duties on local units of government. Opinion of Corrigan, C.J., ante at 325; opinion of Kelly, J., ante at 345-346. It may be that under contract law, the local units are indeed third-party beneficiaries. However, that is simply not dispositive, nor particularly relevant, in this case. The fact remains that local units of government must either create the revenue sharing boards or assume the actual costs incurred by the units of government in the operation of the casinos.

 Furthermore, the compacts “supplant legislative action,” Blank, supra at 114, because they attempt to bind the state to their terms for a period of twenty years, and during those twenty years, the Legislature may not, even by appropriate legislative action, amend or repeal the compacts. Thus, the compacts not only supplant current legislative actions, but in effect, they likewise supplant any future proper legislative action that the Legislature might otherwise undertake regarding this issue.

 It appears that that Court of Appeals considered significant the fact that the compacts do not give the state the power to enforce them other than by arbitration or mediation. The Court of Appeals stated, “While states may have the ability [under IGRA] to negotiate and include regulatory terms in the compacts, there is no mechanism for enforcement. Rather, any dispute is submitted to arbitration or a mediator. Consequently, the challenge to the method of approval by resolution is *386 without merit.” Taxpayers of Michigan Against Casinos v Michigan, 254 Mich App 23, 46; 657 NW2d 503 (2002). Likewise, defendants emphasize, as did the Court of Appeals, id,., that the compacts confer no regulatory power on the state because the responsibility to ensure that the compacts’ “regulatory requirements” are being enforced within the casinos lies solely within the tribes’ hands; and therefore the compacts are not “legislation.” However, igra provides that compacts may include provisions relating to “the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations . . ..” 25 USC 2710(d)(3)(C)(2). Thus, the compacts could have granted the state the jurisdiction to enforce the relevant laws and regulations. Justice KELLY concedes that if the compacts “extend[ed] state jurisdictional authority to tribal land,” they would constitute legislation. Ante at 347. In my judgment, the decision to place the enforcement jurisdiction entirely within the tribes’ hands, as well as the decision to resolve compact disputes through mediation and arbitration, were, in fact, policy decisions made by the Governor that may not now be used to insulate the compacts from a finding that they, constitute legislation. Chief Justice Corrigan likewise refers to many of the compact terms in order to support her contention that the compacts do not constitute legislation. Ante at 324-327. As an example, she notes that “[ujnder the terms of the compacts, the tribes themselves, not the state, regulate the conduct of class III gaming on tribal lands. The Legislature has no obligations regarding the regulation of gaming whatsoever, nor can the state unilaterally rectify a violation of the compacts.” Ante at 324-325. This term, and the other compact terms discussed in the Chief Justice’s opinion, were the direct result of policy choices made on behalf of the state by the Governor and should not now be used circularly to insulate the compacts from being characterized as legislation. It is, in part, precisely because the compacts resolve such fundamental policy choices that they constitute legislation.

 As noted in n 16, MCL 432.203 indicates that the Legislature itself recognized this when it provided in the MGCRA that the Legislature must, if permitted by federal law, enact an act similar to and consistent with the MGCRA that would govern casino gambling in Indian territory, just as the MGCRA governs other casino gambling that is authorized in Michigan.

 My research revealed that every state supreme court that has directly considered this issue has held that tribal-state gaming contracts constitute legislation. The majority cites Confederated Tribes of the Chehalis Reservation v Johnson, 135 Wash 2d 734, 750; 958 P2d 260 (1998), for an opposite conclusion. Opinion of Corrigan, C.J., ante at 324; opinion of Kelly, J., ante at 346. In that case, the Supreme Court of Washington stated that tribal-state compacts are “agreements” and not legislation. However, the issue in that case was whether the compacts were subject to Washington’s public records disclosure act, and the court’s statement regarding the legislative nature of a compact, which was made with no analysis whatever, was therefore not in response to a direct consideration of that question. Justice Kelly likewise string cites Confederated Tribes of Siletz Indians of Oregon v Oregon, 143 F3d 481 (CA 9, 1998), and Gallegos v Pueblo of Tesque, 132 NM 207, 218; 46 P3d 668 (2002). Both those cases are equally irrelevant to the instant issue.

 The majority concludes that legislative approval by resolution was appropriate because the Constitution is a limit on our Legislature’s power rather than a grant of power and, therefore, the Legislature may do anything that it is not specifically prohibited by the Constitution from doing. Opinion of Corrigan, C.J., ante at 327; opinion of Kelly, J., ante at 348. It may well be true that the Constitution is a limit on legislative power, but one of those limits is embodied in Const 1963, art 4, § 22 and § 26, and these require that legislation be by bill. The majority essentially engages in a faulty, circular argument to support the conclusion that the compacts are not legislation.

 A “findings” statement in a federal act is a part of what is commonly referred to as the “preamble.” As long ago as 1889, the United States Supreme Court, in Yazoo & M V R Co v Thomas, 132 US 174, 188; 10 S Ct 68; 33 L Ed 302 (1889), stated: “[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up.” See also Singer, 1A Sutherland Statutory Construction(6th ed), § 20:3, p 123: “The function of the preamble is to supply reasons and explanations and not to confer power or determine rights. Hence it cannot be given the effect of enlarging the scope or effect of a statute.”

 This congressional finding comports with the pre-IGRA opinion of the United States Supreme Court in Cabazon in which the Court acknowledged that if California prohibited casino gambling within its borders, California could enforce its criminal laws relating to that prohibition on Indian lands through 18 USC 1162; hut absent express Congressional permission, California could not enforce its purely regulatory gambling laws on Indian lands. Thus, under Cabazon, Indian tribes indeed had the exclusive right to regulate casino gambling on Indian lands if the gambling was not specifically prohibited by federal law and was conducted within a state that did not prohibit such gambling.

 Compare the United States Constitution, art I, § 1, in which “All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.” (Emphasis added.)

 Westervelt, considered in its totality, actually supports plaintiffs’ position in this case. This is because the compacts constitute legislation, yet the legislative power is exclusively vested in the Legislature. Const 1963, art 4, § 1. Thus, when the Governor negotiated and signed the compacts without having first received a proper delegation of power from the Legislature, he effectively exercised the Legislature’s functions in contravention of Const 1963, art 3, § 2.

 I do not accept the premise of the Chief Justice that, when a state exercises its regulatory authority over casino gambling within its borders, expressly granted to it by Congress, and makes that which was unlawful into that which is lawful, and in doing so binds itself to specific terms and conditions under which that which was unlawful is now lawful, the state is not “legislating” merely because IGRA provides a mechanism by which the tribes may participate in the negotiation process. The pertinent consideration in determining whether a compact constitutes legislation is not whether igra purports to compel a state to negotiate in good faith with a tribe, but rather whether the compact bears the larger hallmarks of “legislation.” These hallmarks are sufficiently expounded upon in ChadhalBlanh, and, as already discussed, I believe they lead to the conclusion that these sorts of compacts constitute legislation.

 If the majority were correct, but for the term in the compacts themselves stipulating that they become effective only upon resolution approval by the Legislature, the Legislature would not be required to approve them. This is because the Legislature’s power is the power to legislate. Const 1963, art 4, § 1. Therefore, unless the compacts constitute legislation, neither the Constitution nor any other source of law would require that they be approved by the Legislature by any method. Thus, under the majority’s faulty analysis, there is no reason that the *397 Governor, in the future, cannot simply bind the state to casino compacts without even seeking resolution approval from the Legislature.
Thus, the compacts would have been effective between the state and the tribe once they had been signed by the Governor.

 See Flint & F Plank-Road Co v Woodhull, 25 Mich 99 (1872), in which Justice Cooley acknowledged that a charter-compact is both a “law” and a contract. “It is not disputed ... that the charter of a private corporation is to he regarded as a contract, whose provisions are binding upon the State .... Such a charter is a law, [and] it... also ... contains stipulations which are terms of compact between the State as the one party, and the corporators as the other. ...” Id. at 101. (Emphasis added.) Thus, a “contract” may clearly he a vehicle for creating both legislation and contractual terms that are binding on the state.

 Because IGRA does not purport to require or allow the Governor to negotiáte a tribal-state compact subject only to a resolution vote, we need *399 not consider whether such a provision in the IGRA would be lawful. However, I note the following statement made by the court in Clark, supra at 577:
[The governor] ... argues that he possesses the authority, as a matter of federal law, to bind the State to the terms of the compact.... We find the Governor’s argument on these points to be inconsistent with core principles of federalism. The Governor has only such authority as is given to him by our state Constitution and statutes enacted pursuant to it.... We do not agree that Congress, in enacting the IGRA, sought to invest state governors with powers in excess of those that the governors possess under state law. Moreover, we are confident that the United States Supreme Court would reject any such attempt by Congress to enlarge state gubernatorial power. Cf. Gregory [v Ashcroft, 501 US 452, 460; 111 S Ct 2395; 119 L Ed 2d 410 (1991)] (recognizing that “[t]hrough the structure of its government... a State defines itself as a sovereign”); New York v. United States [505 US 144, 176; 112 S Ct 2408; 120 L Ed 2d 120 (1992)] (striking down an act of Congress on the ground that principles of federalism will not permit Congress to “ ‘commandeer[] the legislative processes of the States’ ” by directly compelling the states to act) (quoting Hodel v. Virginia Surface Mining & Reclamation Ass’n [452 US 264, 288; 101 S Ct 2352; 69 L Ed 2d 1 (1981)] ....

 See Const 1963, art 5, § 8: “The governor shall take care that the laws be faithfully executed.” See also The People ex rel Sutherland v Governor, 29 Mich 320, 324-325 (1874), in which Justice Cooley stated: “And that there is such a broad general principle seems to us very plain. Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to he a prohibition of its exercise by either of the others.” (Emphasis added.)

 Const 1963, art 3, § 5 provides that it is “subject to general law.” Therefore, a governmental authority may enter into an intergovernmental agreement with an Indian tribe despite the fact that tribes are not specifically mentioned in art 3, § 5 provided the agreement is consistent with provisions of general law. Federal law, under IGRA, permits a state to enter into a tribal-state gambling compact. However, because the compacts at issue constitute legislation, state law, particularly Const 1963, art 4, §§ 22 and 26, requires that they he approved by the Legislature by bill. Therefore, consistently with these provisions of general law, the Legislature may bind the state to tribal-state gambling compacts despite the fact that “Indian tribes” are not specifically referenced in art 3, § 5.

 It is noteworthy that federal case law acknowledges that treaties are both agreements with other sovereignties, and they create “law.” See El Al Israel Airlines, Ltd v Tsui Yuan Tseng, 525 US 155, 167; 119 S Ct 662; 142 L Ed 2d 576 (1999), in which the United States Supreme Court stated: “ ‘Because a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (travaux préparatoires) [italics in original] and the post-ratification understanding of the contracting parties.’ ” (Citation omitted; emphasis added.) The point is that, pursuant to US Const, art II, § 2, treaties are binding even though they amount to lawmaking because the federal Constitution expressly so provides. Thus, that the tribal-state compacts at issue here are akin to contracts with a sovereign power does not, by that fact alone, mean that the compacts do not constitute “lawmaking.” I believe the majority’s conclusion that the compacts are not legislation simply because they are “contracts” with sovereign nations to be without merit. See also n 30.

 Does the Governor possesses some “inherent” authority to bind the state to a legislative compact with only a resolution vote of the Legislature, or indeed unilaterally? While the Governor has the power to issue executive orders on his own accord that have the status of enacted law, the permissible scope of such orders is limited by the express powers constitutionally or legislatively delegated to the Governor. See, generally, House Speaker v Governor, supra at 578-579; see also Straus v Governor, 230 Mich App 222, 228-230; 583 NW2d 520 (1998). Further, the separation of powers doctrine embodied in Michigan’s Constitution provides that “[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.” Const 1963, art 3, § 2. Trihal-state compacts constitute legislation, and all legislative power is constitutionally vested in the Legislature. Const 1963, art 4, § 1. Therefore, the Governor may not bind the state to such a compact under some “inherent” power because the Governor may exercise legislative powers only “as expressly provided in *404 this constitution.” Const 1963, art 3, § 2. Nowhere does our Constitution expressly, or otherwise, grant the Governor a power to bind the state to a legislative agreement with another sovereignty.

 The pertinent question in this case is whether the compacts constitute legislation. Because they do, the Legislature should have approved HCR 115 by bill. If the compacts did not constitute legislation, then no legislative approval, by either bill or resolution, would have been constitutionally required. In that case, the Legislature would have been required to approve the compacts only because the compacts themselves expressly required it in § 11, and either resolution or bill approval of HCR 115 would have been sufficient.

 See § 16 of the compacts.

 The majority concludes that the issue may now be ripe for review, but that this Court should nonetheless decline to review it because the lower courts did not address this issue. Opinion of Corrigan, C.J., ante at 333; opinion of Kelly, J., ante at 350. It is true that the Court of Appeals declined to address the issue. However, the circuit court considered it and *406 found a constitutional violation. Further, the parties briefed this issue and, in my judgment, the record is sufficiently developed that we may consider this question without having to first remand it to the lower courts.

 Justice Kelly concludes that plaintiffs’ challenge to the amendatoryprovision fails because plaintiffs cannot show that “no set of circumstances exists under which the [a]ct would be valid.” Ante at 349. She explains that “[t]here are many conceivable amendments that a governor might make to these compacts. For example, a governor could amend the provision relating to dispute resolution or the provision about the timing of payments.” Id. at 349. For reasons already explained in part iika) of this opinion, Justice Kelly’s examples represent legislative decisions that are properly within the province of the Legislature. That is, such amendment would constitute important policy decisions undertaken in the process of lawmaking and they would supplant legislative action. Therefore, such amendments, undertaken by the Governor and not approved by the Legislature pursuant to Const 1963, art 4, §§ 22 and 26 would offend the separation of powers doctrine. Justice Kelly has not demonstrated that there are, in fact, “conceivable amendments that a governor might make to these compacts,” id., so as to not offend this doctrine.

 Generally, deliberate acts of any of the three branches of government are presumed constitutional and, moreover, “state officials and those with whom they deal are entitled to rely on a presumptively valid state [act], [performed] in good faith and by no means plainly unlawful.” See Lemon v Kurtzman, 411 US 192, 209; 93 S Ct 1463; 36 L Ed 2d 151 (1973). See also Thompson v Washington, 179 US App DC 357; 551 F2d 1316 (1977), Bd of Comm’rs of Wood Dale Pub Library Dist v Co of Du Page, 103 Ill 2d 422; 469 NE2d 1370 (1984), and, of significant interest, Lac Vieux Desert Band of Lake Superior Chippewa Indians v Michigan Gaming Control Bd, 2002 WL 1592596 (WD Mich, 2002).

 The compacts at issue have already been approved by the Secretary of the Interior, and any declaratory judgment along the lines of this dissenting opinion would not, without further action by the Secretary, render such approval null and void.

 Moreover, I fear that the majority’s “contractual” approach to Michigan constitutional law in this case cannot be cabined to apply only *410 to tribal-state casino gambling compacts, and do not understand why it would not be equally applicable to any compact between Michigan and an Indian tribe, a sister state, or a sovereign nation to which the Governor may be inclined to unilaterally bind the state. The majority appears to grant the Governor a broad power, not even implicitly recognized in the Michigan Constitution, to bind the state as the Governor sees fit, as long as the Governor does so within the framework of the majority’s “contractual” approach to compacts, i.e., an approach in which state compacts can be fully understood through resort to the four corners of the compact itself and without consideration to surrounding constitutional circumstances, including the Constitution’s separation of powers doctrine, its legislative processes, and the specific limitations it places upon the individual branches of government.